HENRY SCHWARTZ CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

HENRY SCHWARTZ INDIVIDUALLY AND AS SURVIVING SPOUSE AND AS AN EXECUTOR OF THE ESTATE OF SYDELL SCHWARTZ, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3839–70, 428–72, Filed August 27, 1973.
3845–70, 429–72.

*Julius November*, for the petitioners.
*Patrick E. Whelan* and *Harold Kushner*, for the respondent.

The Commissioner determined deficiencies in income tax as follows:

| Taxpayers | Docket No. | TYE | Deficiency | Addition to tax for negligence—sec. 6653(a), I.R.C. 1954 |
|---|---|---|---|---|
| Henry Schwartz and Sydell Schwartz | 3845-70 | 12/31/65 | $16,620.17 | $831.01 |
| | | 12/31/66 | 1,840.84 | |
| | 429-72 | 12/31/67 | 1,902.19 | |
| | | 12/31/68 | 3,761.60 | |
| | | 12/31/69 | 2,131.17 | |
| Henry Schwartz Corp | 3839-70 | 3/31/66 | 16,789.85 | |
| | | 3/31/67 | 29,253.21 | |
| | 428-72 | 3/31/68 | 60,042.81 | |
| | | 3/31/69 | 54,144.14 | |
| | | 3/31/70 | 25,108.91 | |

At issue is the correctness of the Commissioner's action in (1) including in the taxable income of the individual taxpayers (husband and wife) the cash surrender value of a life insurance policy on the life of the husband, which policy was received by the individual taxpayers in 1965 in connection with the sale of all of the stock of several corporations which they controlled, but which was not reported as income; (2) determining an addition to the tax due from the individual taxpayers for 1965, pursuant to section 6653(a), I.R.C. 1954, because of their negligence in failing to report all of their income for that year; (3) disallowing deductions to the corporate taxpayer of either portions of certain amounts, or the entire amounts, it claimed as travel and entertainment expenses, and treating said amounts, or portions thereof, as dividend income to the husband; (4) disallowing as deductions claimed by the corporation, and including in the gross income of the individual taxpayers, certain amounts relating to the use of an automobile operated by the husband, ownership of which was claimed by the corporation; (5) disallowing to the corporation a claimed

business loss, during the taxable year ended March 31, 1968, arising from the transfer of funds to two other corporations, since it was not established that such loss was sustained during the taxable year, or, alternatively, because the funds transferred represented contributions to capital rather than loans and were subject to the limitations of section 1211, I.R.C. 1954; (6) disallowing to the corporation deductions of portions of certain amounts claimed as compensation to officers, because said amounts were excessive and unreasonable to the extent of the portion disallowed; and (7) not allowing the corporation a dividends paid deduction in computing the personal holding company tax, for those portions of the compensation to officers and travel and entertainment expenses which were disallowed as deductions from gross income.

## FINDINGS OF FACT

The parties have filed a stipulation of facts which, together with accompanying exhibits, is incorporated herein by this reference.

Petitioner Henry Schwartz (Henry or petitioner) resided in Bethpage, N.Y., at the time the petitions herein were filed. His wife, Sydell Schwartz (Sydell), formerly a copetitioner in docket No. 3845–70, died on November 28, 1971, and Henry is the sole executor of her estate He is a petitioner in docket Nos. 3845–70 and 429–72 both individually and in his capacity as executor of his wife's estate. Henry and Sydell filed joint Federal income tax returns for the calendar years 1965 through 1969 with the district director of internal revenue at Brooklyn, New York.

Petitioner Henry Schwartz Corp. is a Massachusetts corporation. Its Federal corporation income tax returns for each of the taxable years ended March 31, 1966, through March 31, 1970, were filed with the district director of internal revenue at Brooklyn, New York. Its principal office was located in Bethpage, N.Y., at the time its petitions herein were filed.

At the time of the trial herein Henry Schwartz was 74 years old; for much of his adult life he had been involved in the business of manufacturing and selling vinyl plastics. In connection with this business he and his wife held controlling interests in a number of corporations, as is described more fully below. During all of the years at issue Henry was the sole paid employee of the Henry Schwartz Corp.; its corporation income tax returns for the taxable years ended March 31, 1966, 1967, 1968, 1969, and 1970, stated that its business was "inactive."

1. and 2. *Life insurance policy and negligence penalty.*—Henry and Sydell were the sole owners of all of the issued stock of the following five corporations: Plastic Calendering Corp., Vinyplas Corp., Delsyd

Corp., Pervs Realty Co., Inc., and Henschwar Realty Co., Inc. On September 21, 1964, they entered into an agreement to sell all of their stock in these corporations to Suval Industries, Inc. With regard to price, this agreement provided in part as follows:

2. Purchase Price. The total purchase price to be paid by the Purchasers to the Sellers for the above-mentioned shares is EIGHT HUNDRED FIFTY THOUSAND ($850,000.00) DOLLARS * * *.

\* \* \* \* \* \* \*

3. Adjusted Purchase Price: The purchase price of $850,000.00 was fixed by the parties hereto in that amount on the assumption that the aggregate book value of the corporate assets whose shares are being sold hereunder shall at the close of business on October 16, 1964 be $605,329.81. If at the time of closing, it shall be ascertained that the book value as of the close of business on October 16, 1964 is in excess of said $605,329.81, the purchase price shall be increased by the amount of such excess on said date; if less than $605,329.81, the purchase price shall be reduced by the amount of the difference.

The agreement further provided, in part, that the purchaser would deliver certain amounts of money, securities, and mortgages to an escrowee to insure that it complied with all of "the terms and conditions of [the] agreement." The purchaser also indicated that it understood that certain sums were owed by several of the corporations whose stock was being sold, to Henry individually. These sums were independent of the purchase price provisions of the agreement and they were to be paid in 60 equal monthly installments after the closing. At the closing the sellers were to deliver all of the stock of the five corporations to the purchaser, who would immediately have new shares issued in lieu thereof, would elect a new board of directors for each corporation, and would, with appropriate waivers of notice, take those actions necessary to effectuate the closing. Purchaser would then deliver the newly issued shares of stock in the five corporations to the escrowee as further collateral security. The sellers, in addition to their other covenants, agreed that "No dividend or distribution of payment [would] be declared or made in respect to the respective corporations' capital stock."

Plastic Calendering owned a life insurance policy on the life of Henry Schwartz. With respect to said life insurance policy, paragraph 8(d) of the agreement stated:

8. Additional Agreements.

\* \* \* \* \* \* \*

(d) The Purchaser further agrees to deliver to the Sellers on March 4, 1965 or upon receipt, a certain existing life insurance policy on the life of HENRY SCHWARTZ, which policy has a cash surrender value of approximately $30,000. The Purchaser also agrees to execute and deliver to the Sellers at the time of delivery a release and any or all other appropriate instruments whereby the Purchaser shall release any and all interest in said life insurance policy, and/or cash surrender value, to said HENRY SCHWARTZ. The Sellers represent that

the said life insurance policy is not listed on the books of any of the corporations whose stock is the subject of the within sale as an asset thereof, and is not included in any computation of book value.

The sale was closed in or about October of 1964, and the policy was delivered to Henry on March 12, 1965. At the time of the trial herein it had not been cashed and was still in existence.

On their 1965 Federal income tax return Henry and Sydell did not report the receipt of the life insurance policy as income. The Commissioner determined that they had received ordinary income in 1965 of $30,000—the cash surrender value of said life insurance policy— and he therefore increased their taxable income by that amount. The Commissioner also determined that part of the underpayment [1] for 1965 was due to negligence or intentional disregard of rules and regulations, and he therefore added to the deficiency for that year 5 percent of the underpayment, as provided for by section 6653(a), I.R.C. 1954.

3. and 4. *Travel and entertainment; depreciation of automobile.*— Lyntex Corp. (Lyntex) was engaged in the manufacture of thin-gauged vinyl sheeting, or "film." In 1962 it sold all its business assets, and changed its name to Henry Schwartz Corp., the corporate petitioner herein. Most, if not all, of its stock was then owned by Henry and Sydell; during the tax years all of its stock was owned by them. The proceeds of the sale—some $700,000 or $800,000—were deposited in the corporation's bank account. As noted above, its income tax returns for the tax years described its business as "inactive," and it did not in fact engage in any business activities during those years apart from the making of a loan, the search for a possible opportunity to re-enter the vinyl plastics manufacturing business, and the purchase and sale of certain equipment—all as hereinafter set forth. All of these activities were conducted on its behalf by Henry, who was its only employee. Its address, as reported on its income tax returns for the years in issue, was the same as Henry's home address. It did not have any other place of business apart from possibly an office occupied by Henry at the premises of Schwartz-Dondero Corp., which was engaged in the manufacture and sale of vinyl plastics and in which Henry owned two-thirds of the stock. The remaining one-third of the stock of Schwartz-Dundero Corp. was owned by a nephew of Henry. Henry devoted about 20 hours, or 2½ days, a week to the affairs of Schwartz-Dondero Corp. During a portion of the years in controversy, Henry also devoted some time to the affairs of two corporations, Springfield Plastics and Triple S Sales, referred to hereinafter.

---

[1] The Commissioner made three additions to Henry and Sydell's income for 1965, to wit: the cash surrender value of the life insurance policy discussed above, a $225.40 addition for unreported interest income which is conceded to be correct, and dividend income for payments made by Henry Schwartz Corp. allegedly for the benefit of Henry, which will be described more fully below.

In or about 1965 Henry became interested in involving Henry Schwartz Corp. again in the active business of manufacturing and selling vinyl plastics. In that connection he began to make inquiries into the acquisition of the necessary plant facilities and machinery. To this end he conducted negotiations from time to time over a period of some 3 or 4 years with representatives of various companies. Thus, around 1965 he had some 10 conferences over a 6-month period with representatives of the Atlantic Refining Corp. in New York and Philadelphia. Similarly, he had some 12 meetings involving the Rand Rubber Co. during the years 1966, 1967, and 1968. Also, he had negotiations at some undisclosed time or times with the "Tenneco Chemical Corporation" looking towards the purchase of land and a building in New Brunswick, N.J. "Around 1967, 1968," he attempted to obtain plant facilities from Air Products Corp. at Belleville, N.J. All of the foregoing efforts, as well as several others which were not satisfactorily described in the record, were unsuccessful. Henry finally obtained plant facilities for his corporation about July 1969 at the Newark-East Orange borderline in New Jersey, and after modification of the building and installation of machinery the plant commenced operations about October 1971.

Although Henry had been unsuccessful in obtaining the plants in connection with his prior negotiations, he did purchase some machinery for the Henry Schwartz Corp. from the Rand Rubber Co., as well as from "Tenneco Chemical Corporation," which the Henry Schwartz Corp. later resold at a profit. In this connection, Henry Schwartz Corp. reported gross profits of $17,805.39 and $12,602.90 from the sale of goods on its income tax returns for its fiscal years ended March 31, 1969, and 1970, respectively.

In addition to the travel already referred to, Henry traveled at some undisclosed time to Lebanon and Harrisburg, Pa., where he obtained a $40,000 refund of State taxes which the Henry Schwartz Corp. had paid during the period that it was known as Lyntex Corp. The refund was in "scrip," which could be used only to pay Pennsylvania taxes, and it was subsequently sold to a bank at a 10-percent discount. Also, at times not clearly fixed in the record around 1966 or 1967, Henry traveled to Lynn, Mass., where he negotiated a deal with Lynn Sales Corp., in which Henry Schwartz Corp. made a loan of $500,000 at 12 percent per annum to Lynn Sales Corp.

Nearly all of Henry's travel referred to above was by automobile. However, the automobile in which he traveled was also used by him for personal purposes of himself and his wife, including his commuting to the plant of Schwartz-Dondero Corp. Apart from the corporate automobile, Henry did not have a car of his own.

In connection with Henry's travel and negotiations he sometimes paid for meals (primarily luncheons) of persons who were with him. However, the only such instances specifically identified in the record were four in 1966 at which Henry's attorney, Richard Morgen, was present. The total cost of the meals on these four occasions was not in excess of $50.

On its corporation income tax returns for its fiscal years ended March 31, 1966 through 1970, Henry Schwartz Corp. claimed deductions for travel [2] in the following amounts:

| TYE Mar. 31— | Amount claimed as deduction |
|---|---|
| 1966 | $3,287.17 |
| 1967 | 4,121.05 |
| 1968 | 4,386.84 |
| 1969 | 5,369.06 |
| 1970 | 6,178.27 |

The parties have stipulated that:

The expenditure of these amounts was substantiated by charge tickets from American Express, Diners Club and various gasoline companies. The majority of the charges for gasoline were incurred in Bethpage, New York.

The Commissioner disallowed the foregoing claimed deductions for the taxable years ended March 31, 1966 and 1967, "to the extent of $2,784.55 and $3,871.05, respectively, for lack of substantiation and because it has not been established that they represent ordinary and necessary business expenses or were expended for the purpose designated. The deductions are disallowed for the further reason that the amounts claimed are not allowable deductions under section 274 of the Internal Revenue Code." The deductions claimed for the taxable years ended March 31, 1968, 1969, and 1970, were disallowed in full "because it has not been established that such [amounts represent] ordinary and necessary business expenses or [were] expended for the purposes designated."

Prior to Henry Schwartz Corporation's fiscal year ended March 31, 1968, the automobile used by Henry in his travel was owned by Schwartz-Dondero Corp. During the fiscal year ended March 31, 1968, Henry Schwartz Corp. acquired a Cadillac automobile, which was the automobile that Henry then used for the various purposes—both personal and business—described above. On each of its income tax returns for the years ended March 31, 1968, 1969, and 1970, Henry Schwartz Corp. claimed a deduction of $917.21 for depreciation in respect of that automobile. The Commissioner disallowed the deduction in its entirety.

---

[2] The deductions claimed were only for "travel," not for "travel and entertainment." However, to a limited extent—in respect of certain meals—petitioner attempted at the trial to include expenses for "entertainment" as well as "travel" in this item, and for convenience we have at times characterized this item as "travel and entertainment."

In respect of both the travel expense deductions and depreciation deductions which the Commissioner disallowed to Henry Schwartz Corp. (as well as a $500 legal expense item in 1968 which is no longer in dispute and which Henry concedes is "personal"), the Commissioner determined that the following amounts represent dividend income to Henry and Sydell, being payments made for their "benefit" and their use of "corporate property without compensation":

| Year | Amount |
|------|--------|
| 1965 | $2,784.55 |
| 1966 | 3,871.05 |
| 1967 | 3,843.08 |
| 1968 | 6,453.40 |
| 1969 | 6,740.41 |

These figures reflect three types of items: (a) The travel and entertainment expenses disallowed to the corporation during each of the years; (b) the $917.21 automobile depreciation deduction disallowed for 1968 and 1969; and (c) the undisputed $500 legal expense item for 1968. These items are shown in the following table:

| Year | Travel and entertainment | Automobile depreciation | Legal expense | Total |
|------|--------------------------|-------------------------|---------------|-------|
| 1965 | $2,784.55 | | | $2,784.5 |
| 1966 | 3,871.05 | | | 3,871.0 |
| 1967 | 3,843.08 | | | 3,843.0 |
| 1968 | 5,036.19 | $917.21 | $500 | 6,453.8 |
| 1969 | 5,823.20 | 917.21 | | 6,740.4 |

The amounts of these components relating to travel and entertainment, as well as to depreciation, are not in dispute, assuming that the Commissioner correctly attributed any amount to the individual petitioners in respect of any such item.

5. *Business loss.*—At some undisclosed time during the years 1967 and 1968 Henry Schwartz Corp. acquired, for between $2,000 and $3,000, 50 percent of the outstanding stock of Springfield Plastics Corp. and a related company, Triple S Sales Corp. This stock was purchased from two brothers who prior thereto owned all of the outstanding stock of these corporations, and who after the sale continued to hold the remaining 50-percent interest therein.

Springfield Plastics and Triple S Sales were involved in the production and sale of one of the basic chemicals used in the manufacture of vinyl plastics, but were experiencing certain difficulties. It was anticipated that if Henry Schwartz Corp. should commence manufacturing operations, and if these two corporations should overcome their problems, there might be available to Henry Schwartz Corp. a supply of this chemical at a lower price than that which it would have to pay

on the open market. However, Springfield Plastics and Triple S Sales continued to have problems in successfully continuing their operations, and in order to help them to meet their obligations and continue in business, Henry Schwartz Corp. made advances of various amounts of money to them. The record does not disclose the dates of these advances, or their amounts, other than Henry's vague testimony that they were generally in round sums of $2,000, $3,000, or $4,000 at a time. Nor does the record contain any notes or other documentation with respect to these advances, notwithstanding some vague testimony that notes were given in connection with these transactions. In any case, after a period of time Henry realized that Springfield Plastics and Triple S Sales had very limited prospects for success, and Henry Schwartz Corp. therefore stopped advancing funds to them. The record does not disclose when this occurred; nor does it establish what success, if any, might have been achieved in an effort to obtain repayment of the advances.

On its corporation income tax return for the taxable year ended March 31, 1968, Henry Schwartz Corp. claimed a deduction of $26,-217.48 as a "loss on business ventures." The Commissioner disallowed this loss "because it has not been established that a loss was sustained during the taxable year. In the event it is established that there was a loss, it is determined that the funds transferred represented contributions to capital rather than loans and are subject to the limitations of section 1211 of the Internal Revenue Code."

6. *Excessive compensation.*—During the years in question Henry was the only paid employee of the corporate petitioner. It was then "inactive," but a portion of his time was devoted to attempting to re-establish it in the plastics manufacturing business. However, not all of Henry's time was devoted to such activities, since he was also employed by the Schwartz-Dondero Corp. and spent some of his time during a portion of this period on the affairs of the Springfield Plastics and Triple S Sales corporations.

On the average Henry worked approximately 2½ days, or 20 hours, per week for the Schwartz-Dondero Corp. During 1964 he was paid approximately $300 per week for this work; this salary later rose to $500 per week for a couple of years, but it was markedly reduced during subsequent years. Henry also worked, during the limited time they were associated with Henry Schwartz Corp., for Springfield Plastics and Triple S Sales. He devoted approximately 8 to 10 hours per week to those corporations, usually spread over 2 calendar days per week. For a period of time he was paid $200 per week for those services; however, after a short time the corporations found themselves unable to pay that salary.

The representations in the income tax returns of Henry Schwartz Corporation that "[a]ll" of Henry Schwartz's time was devoted to its business were not truthful. For the taxable years ended March 31, 1966, 1967, and 1968, all of the corporation's income consisted of interest, and for the taxable year ended March 31, 1969, about 85 percent of its reported income was interest income. The remaining income in the last of these years consisted of gain on the sale of machinery, referred to above. During the taxable years Henry Schwartz did perform some services for the corporate petitioner, as set forth in the findings above in respect of the travel and entertainment issue.

Henry received compensation in the amounts of $10,400, $13,000, $13,000, and $20,000 from Henry Schwartz Corp. for the fiscal years ended March 31, 1966, 1967, 1968, and 1969, respectively, deductions for which were claimed on the corporate returns. The Commissioner disallowed the deductions for portions of those amounts, determining that such portions were excessive, and fixing an amount as reasonable compensation for each year. These figures are reflected in the following table:

| TYE Mar. 31— | Claimed compensation deduction | Compensation deduction allowed | Amount disallowed |
|---|---|---|---|
| 1966 | $10,400 | $4,320.34 | $6,079.66 |
| 1967 | 13,000 | 5,435.86 | 7,564.14 |
| 1968 | 13,000 | 7,876.81 | 5,123.19 |
| 1969 | 20,000 | 11,941.62 | 8,058.38 |

7. *Personal holding company.*—During the years in question all of the stock of the corporate petitioner was owned by Henry and Sydell, and a large portion of its income was interest income. Its interest income, as it related to its adjusted ordinary gross income (AOGI), is reflected in the following table:

| TYE Mar. 31— | Adjusted ordinary gross income (as reported) | Interest income | Percentage of AOGI which is interest income |
|---|---|---|---|
| 1966 | $43,203.36 | $43,203.36 | 100 |
| 1967 | 54,358.61 | 54,358.61 | 100 |
| 1968 | ¹ 78,768.10 | 78,768.10 | 100 |
| 1969 | 119,416.17 | 101,610.78 | ² 85 |
| 1970 | 68,244.28 | 53,156.33 | ² 77 |

¹ This figure reflects the disallowance of the $26,217.48 claimed business loss.
² Approximately.

For each of the taxable years described above the Commissioner treated Henry Schwartz Corp. as a personal holding company and calculated its tax accordingly. He did not reduce this tax in respect of the deductions he had disallowed for compensation to officers and travel and entertainment.

OPINION

RAUM, *Judge:* 1. *Life insurance policy.*—The Commissioner included in Henry's and Sydell's taxable income for 1965, as ordinary income, the cash surrender value of the life insurance policy Henry had received in connection with the sale of the stock of Plastic Calendering and four other corporations. On brief he supported this by arguing that the distribution of the policy constituted a dividend to Henry from Plastic Calendering Corp., pursuant to section 316(a), I.R.C. 1954. Although petitioner appears to concede that the cash surrender value of the policy should have been reported as income in 1965, he argues that the policy was received from Suval Industries, Inc., as part of the consideration for the sale of the stock, and should therefore be treated as a long-term capital gain and not as ordinary income.[3] We agree with the petitioner.

The agreement between Suval Industries, Inc. (Suval), and Henry and Sydell makes it perfectly clear that the policy was to be delivered by the purchaser (Suval) to the sellers (Henry and Sydell). Moreover, in addition to delivering the policy itself Suval was to execute "appropriate instruments" whereby it would release "any and all interest in said life insurance policy." Finally, the agreement also provided that no dividend or distribution would be declared by the sellers with respect to the stock being sold. Thus, it is clear that the distribution of the policy flowed from the corporations whose stock was sold, to Suval, and then from Suval to Henry as part of the overall consideration for the sale of the stock.

In this regard it is important to note that the parties to the agreement, Henry and Sydell and Suval, were dealing at arm's length and indeed had conflicting interests with respect to the treatment of the policy. Thus, if the distribution of the policy was considered as part of the overall price for the stock, and the distribution was from Plastic Calendering to Suval and then to Henry, then Suval might be charged with a dividend on the initial distribution of the policy to it. See *Frithiof T. Christensen,* 33 T.C. 500, 504–505. On the other hand, if the policy were distributed to Henry by Plastic Calendering, not as part of the purchase price for the stock but simply because the purchaser did not want this asset and the sellers had agreed that it would not be part of the sale, then Henry might be charged with receipt of a dividend. See *John R. West,* 37 T.C. 684, 687. Thus, the agreement

---

[3] Petitioner also appears to have abandoned his argument that the policy was constructively received in 1964, and that, therefore, the statute of limitations would bar any assessment in relation thereto. Although this argument was raised for the first (and only) time by petitioners' counsel in his opening statement, it was never again raised during the trial, and has not been mentioned on brief.

between the parties represents an accurate reflection of an arm's-length transaction, and this agreement makes it clear that the policy was distributed from Plastic Calendering to Suval and then to Henry.

This case is similar to *Mayer* v. *Donnelly*, 247 F. 2d 322 (C.A. 5). There the sole stockholder of a corporation entered into an agreement to sell all of its stock to another corporation, the price to be based upon the underlying assets of the corporation being sold. This was determined in accord with the agreement, but four items which were not reflected as assets on the books of the corporation being sold, two of which were life insurance policies on the life of the sole shareholder, were not taken into account in determining the price. The buyer conveyed these items, including the life insurance policies, to the seller. The Government argued that distribution of the life insurance policies, in addition to other distributions at issue, represented a dividend to the seller. The District Court agreed with the Government but the Court of Appeals reversed, 247 F. 2d at 326, stating:

Each of the disputed items was part of the purchase price paid to the taxpayers for their corporate stock. Under the undisputed facts and circumstances, Weiss Brothers [buyer] became the beneficial owners of all the capital stock of Gus Mayer Co., Ltd., on April 30, 1943. Such beneficial ownership was not prevented or postponed by Mayer's [seller] retention of title to the stock pending the ascertainment and payment of the purchase price. If a dividend had been distributed after April 30, the benefit thereof would have accrued not to the taxpayers but to Weiss Brothers. Any such dividend received by the taxpayers after that date was applied as a payment on the agreed purchase price of the stock, and should not be treated as a dividend distributed to the taxpayers.

It is clear that in the instant case beneficial ownership of the stock had passed to Suval well before the policy was distributed to Henry; any dividend distribution could thus only inure to the benefit of Suval.

The cases cited by the Government present a different factual pattern. Thus, for example, in *T. J. Coffey, Jr.*, 14 T.C. 1410, 1417, the payments in issue were specifically found not to have been received as part of the consideration for the sale of the stock. The Court in that case stated:

We do not agree with the petitioners that they received the Cabot payment as part of the consideration for the sale of their stock. *The purchasers did not agree to buy their stock and then turn over to them $190,000 and the Cabot payment in consideration therefor.* From the testimony above set forth it is apparent that they were not interested in the Cabot payment, did not want it included in the assets of the corporation at the time they acquired its stock, and negotiated with petitioners to acquire stock of a corporation whose assets did not include the unwanted Cabot payment. [Emphasis supplied.]

It is clear that what the purchasers did not agree to in *Coffey* is precisely what they did agree to in the instant case.

Accordingly, it is held that the cash surrender value of the policy

should have been reported by Henry and Sydell in 1965 as a long-term capital gain.

2. *Addition to tax.*—The Commissioner determined an addition to tax in respect of Henry's and Sydell's deficiency for 1965, pursuant to section 6653(a), I.R.C. 1954,[4] on the grounds that their failure to report the cash surrender value of the life insurance policy as either ordinary income or capital gain was due to a negligent disregard of rules and regulations. Petitioner defends on the ground that he was not "versed" in tax law and relied upon the advice of his accountant. We find that the Commissioner is correct.

The agreement Henry and Sydell made with Suval Industries, Inc., which provided for the sale of all of the stock of Plastic Calendering Corp. and four other corporations, set out the value of the life insurance policy and what was to be done with it. The fact that the policy had considerable value was never questioned; indeed Henry does not argue that the cash surrender value of the policy should not be included in income, but only that it represents capital gain rather than ordinary income. Thus, while there may be a dispute between the taxpayer and the Commissioner as to how the cash surrender value of the policy should be included in income, there is agreement that it should be included therein.

In light of these facts it is difficult to accept Henry's argument that he relied upon his accountant's advice in not including the value of the policy in income. He recognized the value of the policy when he made the agreement with Suval and he has offered no explanation of what advice he was given by his accountant which led him to believe that the receipt of this valuable property was not income. Moreover, even if Henry did rely to some extent upon the advice of his accountant, under these circumstances this cannot be considered a defense. See *James Soares*, 50 T.C. 909, 914. Henry had been a businessman for many years, and was certainly not totally unacquainted with the tax laws; this is not an area of the law which requires a great deal of sophistication. His actions in not reporting the cash surrender value of the policy as income constituted negligence within the meaning of section 6653(a).

3. *Travel and entertainment.* (a) *Henry Schwartz Corp.*—The Commissioner disallowed the full amount of the deductions claimed by the corporate petitioner for travel and entertainment for the taxable years ended March 31, 1968, 1969, and 1970, and $2,784.55 and $3,871.05 of the amounts claimed in this respect for the taxable years

---

[4] SEC. 6653. FAILURE TO PAY TAX.

(a) NEGLIGENCE OR INTENTIONAL DISREGARD OF RULES AND REGULATIONS WITH RESPECT TO INCOME OR GIFT TAXES.—If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.

ended March 31, 1966 and 1967, respectively, on the grounds that petitioner corporation had not established that such amounts were ordinary and necessary business expenses and had failed to comply with the provisions of section 274(d), I.R.C. 1954.[5] While we think that petitioner corporation has established that some of these expenses are ordinary and necessary business expenses, we agree with the contention of the Commissioner that the requirements of section 274(d) have not been complied with, except with regard to four meals at which Morgen was present.

Section 274(d), I.R.C. 1954,[6] provides that no deduction shall be allowed for expenses of the type involved herein unless by "adequate records" or "sufficient evidence corroborating his own statement" the taxpayer substantiates (1) the amount of the expense, (2) the time and place of the travel or entertainment, (3) the business purpose of the expense, and (4) the business relationship to the taxpayer of the persons entertained. The regulations promulgated by the Commissioner clarify the requirements of this section, setting forth in more detail the exact elements which must be proven to substantiate an expenditure for travel and/or entertainment. See sec. 1.274–5(b) (2) and (3), Income Tax Regs.[7]

Those elements can be proven either by "adequate records" or "sufficient [corroborating] evidence." These two terms are also clarified

---

[5] The parties have stipulated, with reference to the claimed travel and entertainment deductions, that "The expenditure of these amounts was substantiated by charge tickets from American Express, Diners Club and various gasoline companies." At the trial counsel for the Government made clear that this stipulation was not meant to indicate that the provisions of sec. 274(d) had been complied with; only the expenditure—the "laying out"—of those funds was agreed to; the remaining requirements of sec. 274(d) must still be met.

[6] SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES.

(d) SUBSTANTIATION REQUIRED.—No deduction shall be allowed—

(1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home),

(2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, or

(3) for any expense for gifts,

unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item and, (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. The Secretary or his delegate may by regulations provide that some or all of the requirements of the preceding sentence shall not apply in the case of an expense which does not exceed an amount prescribed pursuant to such regulations.

[7] Sec. 1.274–5 Substantiation requirements.

(b) *Elements of an expenditure*—* * *

*　　　*　　　*　　　*　　　*　　　*　　　*

(2) *Travel.* The elements to be proved with respect to an expenditure for travel are—

(i) *Amount.* Amount of each separate expenditure for traveling away from home, such as cost of transportation or lodging, except that the daily cost of the traveler's own breakfast, lunch, and dinner and of expenditures incidental to such travel may be aggre-

and explained in detail by the regulations. Thus, section 1.274-5(c) (2), Income Tax Regs., provides, in part,

Sec. 1.274-5 Substantiation requirements.

(c) *Rules for substantiation.*—* * *

(2) *Substantiation by adequate records*—(i) *In general.* To meet the "adequate records" requirements of section 274(d), a taxpayer shall maintain an account book, diary, statement of expense or similar record (as provided in subdivision (ii) of this subparagraph) and documentary evidence (as provided in subdivision (iii) of this subparagraph) which, in combination, are sufficient to establish each element of an expenditure specified in paragraph (b) of this section. It is not necessary to record information in an account book, diary, statement of expense or similar record which duplicates information reflected on a receipt so long as such account book and receipt complement each other in an orderly manner.

(ii) *Account book, diary, etc.* An account book, diary, statement of expense or similar record must be prepared or maintained in such manner that each recording of an element of an expenditure is made at or near the time of the expenditure.

It is clear from the evidence that Henry kept no written record or diary which would satisfy the "adequate records" requirement, and petitioners have conceded this on brief. Rather, they rely on the provision for "sufficient [corroborating] evidence," arguing that this is satisfied by Morgen's testimony. We agree with them only with respect to the four meals Morgen testified to; in no other respect does his testimony provide "sufficient [corroborating] evidence."

Section 1.274-5(c)(3), Income Tax Regs., provides in part,

Sec. 1.274-5 Substantiation requirements.

(3) *Substantiation by other sufficient evidence.* If a taxpayer fails to establish to the satisfaction of the district director that he has substantially complied with the "adequate records" requirements of subparagraph (2) of this paragraph with respect to an element of an expenditure, then, except as otherwise provided in this paragraph, the taxpayer must establish such element—

gated, if set forth in reasonable categories, such as for meals, for gasoline and oil, and for taxi fares;

(ii) *Time.* Dates of departure and return for each trip away from home, and number of days away from home spent on business;

(iii) *Place.* Destinations or locality of travel, described by name of city or town or other similar designation; and

(iv) *Business purpose.* Business reason for travel or nature of the business benefit derived or expected to be derived as a result of travel.

(3) *Entertainment in general.* Elements to be proved with respect to an expenditure for entertainment are—

(i) *Amount.* Amount of each separate expenditure for entertainment, except that such incidental items as taxi fares or telephone calls may be aggregated on a daily basis;

(ii) *Time.* Date of entertainment;

(iii) *Place.* Name, if any, address or location, and designation of type of entertainment, such as dinner or theater, if such information is not apparent from the designation of the place;

(iv) *Business purpose.* Business reason for the entertainment or nature of business benefit derived or expected to be derived as a result of the entertainment and, except in the case of business meals described in section 274(e)(1), the nature of any business discussion or activity;

(v) *Business relationship.* Occupation or other information relating to the person or persons entertained, including name, title, or other designation, sufficient to establish business relationship to the taxpayer.

(i) By his own statement, whether written or oral, containing specific information in detail as to such element; and

(ii) By other corroborative evidence sufficient to establish such element.

If such element is the description of a gift, or the cost, time, place, or date of an expenditure, the corroborative evidence shall be direct evidence, such as a statement in writing *or the oral testimony of persons entertained* or other witness setting forth detailed information about such element. * * * [Emphasis supplied.]

Although it has been held that oral testimony can provide corroborating evidence (see *LaForge* v. *Commissioner*, 434 F. 2d 370, 372 (C.A. 2), affirming in part and reversing in part 53 T.C. 41), Morgen's testimony was not "sufficient" within the meaning of this regulation, except with respect to the four meals previously mentioned. See *Hughes* v. *Commissioner*, 451 F. 2d 975, 978 (C.A. 2), affirming a Memorandum Opinion of this Court; cf. *Norman E. Kennelly*, 56 T.C. 936, 942–943, affirmed 456 F. 2d 1335 (C.A. 2). He was able to testify only as to those matters on which he had worked, and the work which he had performed. He was not involved in all of the "transactions" mentioned by Henry in his testimony, and with respect to those in which he was involved, he often played a very small role. Moreover he did not usually travel with Henry, and he was therefore unable to supply the specific information required with respect to any such travel. Thus, while his testimony did support the argument that there was a business purpose behind some of the travel testified to by Henry, the other requirements of section 274 were still not complied with.

The exceptions to this are the four meals which Morgen and Henry ate together, for which Henry paid. The cost of these meals, their date and location, the business purpose for each meal, and the business relationship of those present were all testified to. Thus, with respect to those meals the provisions of section 274 were complied with, and it would appear that a deduction is allowable in respect of the cost of such meals, which we have found not to be in excess of $50. However, the evidence shows that the dates of those four meals covered the period March 25 to October 10, 1966, spanning the 2 fiscal years ended March 31, 1966 and 1967, and we have no way of knowing whether they may not have been included in those portions of the deductions for those 2 years which the Commissioner did allow. In the circumstances, we are unable to find that the Commissioner erred even to this limited extent.

(b) *Henry and Sydell.*—With respect to the travel and entertainment deductions claimed by the corporation and disallowed by the Commissioner, the Commissioner included in Henry's and Sydell's gross income for the years 1965, 1966, 1967, 1968, and 1969 the amounts $2,784.55, $3,871.05, $3,843.08, $5,036.19, and $5,823.20, respectively, as dividend income. While we agree with the Commissioner's contention that the economic benefit of those expenditures, as long as they

were not for ordinary and necessary business expenses of the corporation, could only have inured to the individual petitioners, we think that a portion of those expenditures was in fact allocable to ordinary and necessary business expenses of the corporation, and we therefore approve the inclusion of only the remainder in Henry's and Sydell's gross income as a constructive dividend.

Although we need not discuss the evidence in this confusing record, we are satisfied that Henry did in fact incur some portion of the disputed expenses on behalf of Henry Schwartz Corp. And while the evidence was not sufficient to comply with the requirements of section 274 so as to permit deductions to the corporation, it was nevertheless sufficiently convincing to establish that only portions of the amounts disallowed as deductions to the corporation could properly furnish the basis for treating such amounts as constructive dividends to the individual petitioners. In this situation, doing the best we can with the materials at hand (cf. *Cohan v. Commissioner*, 39 F. 2d 540, 544 (C.A. 2)), we hereby find as a fact that 30 percent of the amounts in controversy in respect of travel and entertainment for each of the years 1965, 1966, and 1967, and 50 percent of the corresponding amounts for 1968 and 1969, represent corporate expenses which may not be treated as constructive dividends to the individual petitioners. The remainder for each year was properly included in the gross income of the individual petitioners as a constructive dividend.

4. *Depreciation of automobile.*—The Commissioner disallowed in its entirety a deduction claimed by the corporate petitioner, for the taxable years ended March 31, 1968, 1969, and 1970, for depreciation of an automobile, and included the amount claimed for each year in Henry's and Sydell's gross income for 1968 and 1969, arguing on brief that the car was used for personal purposes. What we have said and found in respect of the travel and entertainment expense item is dispositive of this issue as well.

Section 167(a), I.R.C. 1954, provides a deduction for depreciation "of property used in the trade or business." It seems clear from the facts that this automobile was such property, although its use was not confined solely to business purposes. An allocation between business and personal use is therefore appropriate, and the same percentages of business use that we found in connection with the travel and entertainment item are equally applicable here.

Accordingly, since the strict substantiation requirements of section 274 do not govern in the case of depreciation deductions, the corporate petitioner is entitled to a depreciation deduction measured by the percentage of business use, and the excess, representing personal use, is chargeable to the individual petitioners as a constructive dividend since, in our judgment, it may reasonably be regarded as the fair market value of their personal beneficial use of corporate property.

5. *Business loss.*—In respect of the "loss on business ventures" which the corporate petitioner claimed to have sustained during the taxable year ended March 31, 1968, the Commissioner contends that neither the amount of the alleged loss nor the year in which it occurred has been established. Alternatively, if it is held that a loss in that amount has been substantiated for that year, the Commissioner argues that any amounts advanced to Springfield Plastics and Triple S Sales were contributions to capital, rather than loans, and any claimed loss is subject to the limitations of sections 1211 and 1212, I.R.C. 1954. Since we agree with the Commissioner that petitioner corporation has not carried its burden of establishing either the amount of any loss or the year in which it was incurred we find it unnecessary to reach his alternative argument.

The Commissioner's determination is presumed to be correct, and the burden is upon the taxpayer to prove that it is wrong. *Welch* v. *Helvering*, 290 U.S. 111, 115. Petitioner has completely failed in this respect. Neither the amount of the alleged indebtedness was shown, nor was there any satisfying evidence that the alleged loss, if any, occurred during the taxable year ended March 31, 1968. The record is wholly deficient in this respect, and we cannot find that the Commissioner erred in his determination as to this item.

The only evidence offered in support of the claimed deduction was Henry's very general, and often vague, testimony. He testified that the loss was incurred because "advances" or "loans" made by the corporate petitioner to Springfield Plastics and Triple S Sales became worthless. However, the amounts of those advances were never established, other than that they were not in odd amounts of money but were for $2,000, $3,000, or $4,000 at a time. The very specific amount of the loss—which was not a round figure and allegedly did not include any "accrued interest"—was unexplained except that it was calculated "by the accountants"; however, no accountants were called to testify, and no documentation was offered to show how this figure was derived. Moreover, although the amount of the loss was very specific, Henry was unable to recall how much had been paid for the stock in the two corporations, other than to estimate the cost as between $2,000 and $3,000. The time of the advances was also never established, other than that they took place within "six to nine months" after the initial purchase of the stock in the two corporations, which purchase took place around "the year 1967, 1968." Moreover, although Henry offered vague testimony concerning notes which supposedly evidenced the advances, no such notes, or copies thereof, were offered into evidence. Finally, there was no evidence substantiating when any of the advances became worthless. Henry testified that he decided to "call it quits at that time"; however, the exact date this occurred, and what "call[ing] it quits" involved, was never established. Indeed, there was no evi-

dence offered concerning any efforts made to collect any of these moneys.

In light of the above it is clear that the corporate petitioner has failed to establish either the amount of any loss or the year in which it was incurred, and has not carried its burden of proving that the Commissioner's determination was incorrect.

6. *Compensation to officers.*—The Commissioner disallowed portions of the deductions claimed by the corporate petitioner for compensation paid to Henry during the taxable years ended March 31, 1966, 1967, 1968, and 1969, on the ground that such portions were unreasonable and excessive. We hold that no error has been shown in the Commissioner's determination.

Section 162(a)(1), I.R.C. 1954, allows a deduction for "reasonable * * * compensation for personal services actually rendered." What is "reasonable" is a factual question, which must be determined on the record presented in each case. See *Huckins Tool & Die, Inc.* v. *Commissioner*, 289 F. 2d 549, 552 (C.A. 7), affirming a Memorandum Opinion of this Court; *Golden Construction Co.* v. *Commissioner*, 228 F. 2d 637, 638 (C.A. 10), affirming a Memorandum Opinion of this Court.

The corporate petitioner in this case had sold all its business assets in 1962, some 3 or 4 years prior to the commencement of the first of the 4 taxable years in which this issue is raised. All of its reported income during the first 3 of the taxable years was passive in character, namely, interest, and about 85 percent of its reported income in the fourth was interest. Its stock was wholly owned by the individual petitioners, and Henry was its sole employee. Its returns untruthfully reported that "[a]ll" of Henry's time was devoted to its affairs. To be sure, the evidence does establish that he did perform some services for the corporation. These consisted primarily of attempts to reestablish it in the business of manufacturing and selling vinyl plastics—an event which did not occur until after the tax years involving this issue—the making of a loan to Lynn Sales Corp., and the purchase and sale of certain items of machinery. But the extent and continuity of such services was, in our judgment, exaggerated by Henry in his testimony before us.

We cannot say that the Commissioner erred in his determination as to reasonable compensation for these part-time efforts. The matter is entirely factual and little useful assistance can be obtained from decided cases presenting different factual patterns. The Commissioner's determination of reasonableness of an officer's salary carries a presumption of correctness, see *Ben Perlmutter*, 44 T.C. 382, 401, affirmed 373 F. 2d 45 (C.A. 10), and we do not find any error in his determination upon the record before us.

7. *Personal holding company.*—By far the greater portion of the aggregate deficiencies determined by the Commissioner against Henry Schwartz Corp. was attributable to his classification of the corporation as a personal holding company and the determination that it was therefore subject to the 70-percent personal holding company tax for each taxable year under section 541 of the Code. His action in this respect was not challenged on brief, and to the extent that any such issue had been raised in the pleadings,[8] we regard it as abandoned. In any event, the record amply establishes the correctness of the Commissioner's classification of the corporation as a personal holding company. All of its stock was owned by Henry and Sydell during the taxable years, and more than 60 percent of its adjusted ordinary gross income in each year consisted of interest (i.e., personal holding company income as defined in section 543(a)(1)), thereby satisfying the definitional requirements for personal holding company classification set forth in section 542(a)(1) and (2).

There remains in controversy merely the computation of the amount of "undistributed personal holding company income" upon which the 70 percent tax is imposed under section 541. The term "undistributed personal holding company income" is defined in section 545(a) to mean its taxable income (adjusted in respects not relevant here) minus the "dividends paid deduction," which in turn is defined and limited in sections 561 and 562. And particularly involved here are those provisions in section 562(c),[9] which preclude "preferential dividends," as defined therein, from being considered as dividends for purposes of computing the "dividends paid deduction."

The remaining issue in this case is whether those portions of the corporation's deductions for travel and entertainment expenses and for Henry's compensation which the Commissioner had disallowed as deductible expenses are to be treated as distributions of dividends which qualify for the "dividends paid deduction" and are not affected

---

[8] No assignment of error was made in the petitions herein in respect of the classification of the corporation as a personal holding company as to any of the years involved except in par. 4(K) of the petition in docket No. 428–72 which assigned as error the determination that "For the fiscal year ended March 31, 1970 the corporation qualified as a personal holding company and was therefore subject to the personal holding company tax." Also, among the "facts" alleged in that petition was the statement (in par. 4(L)(f)) that "The corporation did not qualify and was not subject to the personal holding company tax for the years involved [fiscal years ended Mar. 31, 1968, 1969, and 1970, in that pleading]." No assignment whatever in this respect was made in the petition in docket No. 3839–70, relating to the fiscal years ended Mar. 31, 1966 and 1967.

[9] Sec. 562(c) provides:

SEC. 562. RULES APPLICABLE IN DETERMINING DIVIDENDS ELIGIBLE FOR DIVIDENDS PAID DEDUCTION.

(c) PREFERENTIAL DIVIDENDS.—The amount of any distribution shall not be considered as a dividend for purposes of computing the dividends paid deduction, unless such distribution is pro rata, with no preference to any share of stock as compared with other shares of the same class, and with no preference to one class of stock as compared with another class except to the extent that the former is entitled (without reference to waivers of their rights by shareholders) to such preference.

by the "preferential dividends" limitation. We consider each of these classes of deductions separately.

(a) *Travel and entertainment.*—We sustained the Commissioner's disallowance of the deductions for travel and entertainment expenses solely because there was a failure to satisfy the requirements of section 274, and found that only a portion of the amounts thus disallowed were to be included as dividends in Henry's and Sydell's gross income. Accordingly, it is only such portion that may be considered as eligible for consideration for the "dividends paid deduction." However, the Commissioner contends that the dividends which are thus to be treated as having been paid by the corporation are attributable only to Henry, and not to Sydell in any part, and that they are "preferential dividends," not eligible for inclusion in the "dividends paid deduction." We hold otherwise.

The expenses in question appear to relate primarily, if not exclusively, to the operation of the automobile driven by Henry. To the extent that the automobile was not used in connection with the business of the corporate petitioner, it was in fact the family car. Although the matter may not be free from doubt, we think that on the whole, the dividends attributable to this item reflected benefits to both Henry and Sydell and are not disqualified as "preferential dividends" in the computation of the "dividends paid deduction."

(b) *Excessive compensation to Henry.*—A different result is required as to the disallowed portions of the deductions for Henry's salary. That salary was clearly paid only to Henry, and not to Henry and Sydell. To be sure, there is some contention that Henry was the sole stockholder of the corporate petitioner, and if that were true there would not be any preferential dividend. The record is too murky for us to make any such finding, and suggests rather that Henry and Sydell each owned 50 percent of the stock. Since we were not confident that they owned the stock in precisely those percentages, we did not make any finding to that effect; but we were satisfied that together they were the sole stockholders and we so found. In the circumstances we see no escape from the conclusion that since the amounts allocable to Henry's excessive compensation were paid to him alone, they were "preferential dividends" within the plain meaning of section 562(c).[10]

*Decisions will be entered under Rule 50.*

---

[10] Cf. *Spring Street Realty Co.* v. *Commissioner,* 123 F.2d 146 (C.A. 3), affirming 10 P.H. B.T.A. Memo. par. 41,352; *Dormore Investment Co.,* 11 P.H. B.T.A. Memo. par. 42,254; *William Winter and Son,* 11 P.H. B.T.A. Memo. par. 42,002. Although these cases involve secs. 27(g) and 27(h) of the Revenue Acts of 1936 and 1938, respectively, those sections are closely related to the present sec. 562(c). See H. Rept. No. 1337, 83d Cong., 2d Sess., p. A181 (1954); S. Rept. No. 1622, 83d Cong., 2d Sess., p. 325 (1954); cf. H. Rept. No. 1860, 75th Cong., 3d Sess., p. 23 (1938); sec. 1.562–2(a), Income Tax Regs.