A. R. MORGAN and MARIAN N. MORGAN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Morgan v. Commissioner
Docket Nos. 2073-74, 2081-74, 2085-74, 2086-74.
United States Tax Court
T.C. Memo 1976-271; 1976 Tax Ct. Memo LEXIS 132; 35 T.C.M. (CCH) 1185; T.C.M. (RIA) 760271; August 24, 1976, Filed *132 Held, life insurance policies which petitioners received in connection with the sale of all of the stock of several corporations which they controlled were part of the consideration for the sale of stock. Accordingly, the policies' cash surrender value represented long-term capital gain in the year received. William E. Scent,Michael J. Clare, and David W. Gray, for the petitioners. Philip G. Owens, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined deficiencies in petitioners' 1969 and 1970 income taxes as follows: 1969
1970
A. R. Morgan and
Marian N. Morgan
$7,252.87
Clem F. Burnett, Jr.
[1]
and Evelyn Burnett
$6,870.00
$1,540.68
Donald C. Haugh
and Janet S. Haugh
$5,708.41
William B. Simpson
and Dorothy F. Simpson
$6,837.93
*133 The sole issue remaining is whether certain life insurance policies which A. R. Morgan, Clem F. Burnett, Jr., Donald C. Haugh, and William B. Simpson received in connection with the sale of all of the stock of several corporations which they controlled constituted a dividend to them or part of the consideration for the sale of stock. FINDINGS OF FACT Some facts were stipulated and are found accordingly. A. R. Morgan, Clem F. Burnett, Jr., Donald C. Haugh, and William B. Simpson (hereinafter petitioners) and their respective wives, Marian, Evelyn, Janet, and Dorothy, were residents of Mayfield, Kentucky, when they filed their respective 1969 joint income tax returns with the District Director of Internal Revenue, Louisville, Kentucky, and when they filed their respective petitions in this case. On April 30, 1969, petitioners and two other individuals owned the following shares [2] in four corporations: Fuller-Morgan
Hosco Realty Shareholder
Hospital, Inc.
Company, Inc.
A. R. Morgan
72
100
Clem F. Burnett, Jr.
72
100
Donald C. Haugh
72
100
William B. Simpson
72
100
288 shares
400 shares
*134 B and S
L and R Shareholder
Enterprise, Inc.
Pharmacy, Inc.
A. R. Morgan
100
50
Clem F. Burnett, Jr.
100
50
Donald C. Haugh
100
50
William B. Simpson
100
50
J. S. Cole, Jr.
50
E. W. Fuller
50
400 shares
300 shares
In a contract entitled "Agreement and Purchase of Stock" (hereinafter Agreement), Hospital Corporation of America (hereinafter HCA) offered petitioners $1,934,856, less long-term and short-term corporate debt which HCA would assume, for petitioners' stock in Fuller-Morgan Hospital, Inc., Hosco Realty Company, Inc., and B and S Enterprise, Inc.[3] HCA's attorneys drafted the Agreement, and although it was signed sometime after May 1, 1969, it was to take effect as of May 1, 1969. The Agreement stated, in part, as follows: 2. Delivery of Documents and Shares at Closing. On the Closing Date, hereinafter defined, Stockholders will deliver certificates for the shares of the affiliated corporations, duly endorsed with signatures quaranteed, so as to make HCA the sole owner thereof, free and clear of all claims, liens, charges and *135 encumbrances * * * Also, Stockholders will deliver to HCA on such date the following: * * *
(c) All assignments, deeds, bills of sale, insurance policies, contracts, mortgages, deeds of trust, leases, accounts receivable, purchase orders, books of account and business records, and all other documents pertaining to the business or any property owned or used by the affiliated corporations * * * in their operations. * * *
5. Representation of HCA. HCA agrees that certain insurance policies owned by Fuller-Morgan Hospital, Inc., attached hereto as collective Exhibit C, shall be retained by Stockholders, and HCA hereby waives any interest therein. 6. Prohibited Acts.The affiliated corporations agree not to do any of the following things prior to the Closing Date, and Stockholders agree that prior to the Closing Date they will not request or permit the affiliated corporations to do any of the following things: (a) Declare or pay any dividends or other distributions on its stock or purchase or redeem any of its stock; * * *
7. Closing Date; Conditions of Closing. The Closing Date herein referred to shall be May 31, 1969, or such other date as the *136 parties hereto may mutually agree upon.
William E. Martin, the attorney who drafted the Agreement for HCA, did not attend any of the sales negotiations nor the closing. His only connection with the sale of petitioners' stock was the drafting of the Agreement. In drafting that Agreement, he relied solely on his conversation with Doctor Thomas Frist, Jr., a representative of HCA. At trial he admitted that the language of paragraph 5 was perhaps imprecise, that he did not really know who owned the insurance policies, and that all he knew was that petitioners were going to get the insurance policies in connection with the deal. On May 31, 1969, the closing date, long-term and shortterm corporate debt totalled $306,329.52; accordingly, the purchase price was adjusted downward. On that same day, pursuant to the Agreement, petitioners assigned and delivered all of the outstanding capital stock in Fuller-Morgan Hospital, Inc., Hosco Realty Company, Inc., and B and S Enterprise, Inc., to the purchaser, HCA. Fuller-Morgan Hospital, Inc. (hereinafter Fuller-Morgan), *137 held eight life insurance policies, two on the life of each petitioner. Petitioners were to receive these policies in connection with the sale of their stock. On May 31, 1969, petitioner Morgan telephoned Henry M. Johnson, Jr. (hereinafter Johnson), general agent for Northwestern Mutual Life Insurance Company, the life insurance company which issued the life insurance policies. He requested that Johnson mail him all the forms which had to be completed to transfer ownership of the Fuller-Morgan policies to the respective petitioners insured under the policies.
On June 13, 1969, petitioners Morgan and Burnett signed ownership endorsements on behalf of Fuller-Morgan. Morgan signed as corporate president, and Burnett signed as secretary-treasurer. Each ownership endorsement requested the ownership of the various insurance policies be transferred from Fuller-Morgan to the individual petitioner whose life was insured under the policy. HCA authorized Morgan and Burnett to sign the ownership endorsements since HCA had not yet elected new officers. On June 16, 1969, Joseph S. Cole, then administrator of Fuller-Morgan, wrote a letter to Johnson in which he enclosed all policies, releases, *138 and transfers so that the policies could be transferred from Fuller-Morgan to the individual petitioners. On or about July 16, 1969, and thereafter each petitioner received the policies from Northwestern Mutual Life Insurance Company. Ownership of the policies had been transferred to petitioners. Petitioners wanted the consideration for their stock, including the insurance policies, to be equal since they held the same number of shares in each corporation. Petitioner Donald C. Haugh's policies were of greater value than those of the other petitioners. To assure equal consideration, he paid the other petitioners sufficient amounts to compensate them for receiving policies with less cash surrender value than his own. Petitioners treated the transfer of the policies in the computation of their estimated tax and on their 1969 income tax returns as though the policies were part of the consideration for the sale of their stock. OPINION Fuller-Morgan Hospital, Inc. owned certain life insurance policies which it transferred to petitioners during 1969, the year in issue. Respondent contends that distribution of these policies constituted a dividend to petitioners, pursuant *139 to section 316(a). [4] Given his contention, respondent concludes that the cash surrender value of these policies was ordinary income to petitioners. Petitioners, on the other hand, contend that the policies were part of the consideration for the sale of their corporate stock. Given their contention, they conclude that they are liable merely for long-term capital gain.
We are confident that petitioners thought they were receiving the policies as part of the consideration for the sale of their stock. There is credible testimony to this effect. Furthermore, petitioners' actions support that testimony. Each petitioner held the same number of shares in each corporation as the other three petitioners. They wanted the consideration for those shares, including the insurance policies, to be equal. However, petitioner Donald C. Haugh's policies were of greater value than those of the other petitioners. To assure equal consideration, he therefore paid the other petitioners sufficient amounts to compensate them for receiving policies with less cash surrender value than his own. Petitioners also treated *140 the transfer of the policies in the computation of their estimated tax and on their 1969 income tax returns as though the policies were part of the consideration for the sale of their stock. While petitioners may have thought the policies were part of the consideration for the sale of stock, the ultimate question herein is whether this is what actually occurred. Tax consequences are determined by what was done rather than what might have been done. Sam E. Wilson, Jr., 27 T.C. 976 (1957), affd. 255 F. 2d 702 (5th Cir. 1958). Whether the transfer of certain assets constitutes a dividend or consideration for sale of stock has been before this Court many times. After carefully comparing the facts and legal principles of the cases to the facts of the instant case, we hold for petitioners. First, paragraph 6 of the Agreement specifically forbids petitioners the right to request or permit Fuller-Morgan to declare or pay any dividend. In Henry Schwartz Corp.,60 T.C. 728, 738 (1973), in which there was a similar restriction, we held the life insurance policy was part of the consideration for the sale of the stock. Second, paragraph *141 2 of the Agreement requires that the stockholders (petitioners) deliver to HCA, on the closing date, May 31, 1969, "[all] * * * insurance policies." Thereafter, on June 16, Joseph S. Cole, administrator of Fuller-Morgan, by then wholly owned by HCA, mailed the life insurance policies to the general agent of Northwestern Mutual Life Insurance Company so that the policies could be transferred from Fuller-Morgan to the individual petitioners. This is evidence that the distribution of the policies flowed from the corporation whose stock was sold, Fuller-Morgan, to the buyer, HCA, and then from HCA to the sellers, that is, petitioners herein. The manner of distribution is significant; Schwartz, supra at 738, explains why: [If] the distribution of the policy was considered as part of the overall price for the stock, and the distribution was from [the corporation whose stock was purchased] to [the purchaser] and then to [the seller], then [the purchaser] might be charged with a dividend on the initial distribution of the policy to [the purchaser].See Frithiof T. Christensen,33 T.C. 500, 504-505. On the other hand, if the policy were distributed *142 to [the seller] by [the corporation whose stock was purchased], not as part of the purchase price for the stock but simply because the purchaser did not want this asset and the seller had agreed that it would not be part of the sale, then [the seller] might be charged with receipt of a dividend. See John R. West,37 T.C. 684, 687. Third, on June 13, 1969, petitioners Morgan and Burnett signed ownership endorsements on behalf of Fuller-Morgan as corporate officers since HCA had not yet elected new officers. In those endorsements they requested that the ownership of the various policies be transferred from Fuller-Morgan to the individual petitioners. They signed the endorsements only after they had received permission from HCA to do so. Petitioners' request for permission and HCA's granting of it indicates that the parties recognized that the policies were within HCA's control. Respondent presents a number of arguments and cites a number of cases which we find unpersuasive. First, respondent contends that the language of the sales agreement and the testimony of the witnesses establish that petitioners did not receive the insurance policies as part of *143 the consideration for the sale of their stock. He places special emphasis on pargraph 5 of the Agreement which states: HCA agrees that certain insurance policies owned by Fuller-Morgan Hospital, Inc., attached hereto as collective Exhibit C, shall be retained by Stockholders, and HCA hereby waives any interest therein. Respondent argues that if HCA waived any interest in the policies, then the policies would flow directly from Fuller-Morgan to petitioners, giving them dividend income. Paragraph 5, however, conflicts directly with paragraph 2, which indicates that petitioners are to deliver to HCA, on the closing date, "[all] * * * insurance policies." In such a case as this, where an agreement between the parties contains conflicting paragraphs, we may look beyond the words of the agreement to the intentions and actions of the parties. Lacy v. Commissioner,341 F. 2d 54 (10th Cir. 1965), affg. 39 T.C. 1100 (1963). It is fortunate that we can do so, for William E. Martin, who drafted the Agreement for HCA, testified that he did not attend any of the sale negotiations nor the closing. Indeed, his only connection with the sale of petitioners' stock *144 was the drafting of the Agreement. In drafting that Agreement, he relied solely on his "conversation with Doctor Frist, Jr.," a representative of HCA. He admitted that the language of paragraph 5 was perhaps imprecise, that he really did not know who owned the insurance policies, and that all he "knew was that [petitioners] were going to get [the insurance policies] in connection with the deal." Given such testimony, paragraph 5 provides little support for respondent's position, particularly since respondent failed to present the testimony of Dr. Frist. If anything, we are inclined to believe that paragraph 5 was Martin's attempt, however poorly executed, to assure that petitioners were to receive the insurance policies as part of the purchase price. Second, respondent contends that HCA's books of account reflect that neither buyer nor seller intended to include the value of the life insurance policies within the purchase price. After a careful review of HCA's books, we are not sufficiently impressed by either their accuracy or completeness to accept respondent's contention. Third, respondent contends that petitioners have failed to sustain their burden of proving that *145 the insurance policies were part of the purchase price. In particular, respondent emphasizes that Dr. Burnett was the only petitioner to appear. It is apparent from the record in this case that Dr. Burnett was the spokesman for petitioners during the sale negotiations. Thus petitioners have provided us with the credible testimony of a key witness.We think they have carried their burden for the reasons explained earlier in this opinion. Fourth, respondent cites John R. West,37 T.C. 684 (1962), and T. J. Coffey, Jr.,14 T.C. 1410 (1950), in which this Court held that the distribution of certain assets constituted a dividend and not partial consideration for the sale of stock. These cases are distinguishable. In both of them, the distributed assets were clearly excluded from the sale; ownership of them flowed directly from corporation to seller. That is not the situation in this case. Petitioners attempt to raise on brief an issue concerning their basis in the L and R Pharmacy, Inc. stock. They candidly admit that they did not plead error with respect to this issue. Accordingly, they have conceded it. Rule 34, Tax Court Rules of Practice and *146 Procedure.
Because of concessions, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Clem F. Burnett, Jr., and Evelyn Burnett, docket No. 2081-74; Donald C. Haugh and Janet S. Haugh, docket No. 2085-74; and William B. Simpson and Dorothy F. Simpson, docket No. 2086-74.↩
1. The amount of the Burnetts' 1970 tax was not in dispute at trial.↩
2. These shares constituted all of the outstanding stock of the four corporations.↩
3. In a separate agreement, HCA offered petitioners and two other parties $65,144 for their L & R Pharmacy, Inc. stock.↩
4. Statutory references are to the Internal Revenue Code of 1954, as amended.↩