ESTATE OF ANTHONY GACEK, Deceased, CHARLES D. FOX, III, Executor, ET AL., [1] Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent Estate of Gacek v. Commissioner
Docket Nos. 17890-81, 17891-81, 17892-81, 17893-81, 10059-82, 10060-82, 10061-82, 10062-82, 458-84.
United States Tax Court
T.C. Memo 1987-349; 1987 Tax Ct. Memo LEXIS 349; 53 T.C.M. (CCH) 1342; T.C.M. (RIA) 87349; July 20, 1987. J. Waller Harrison, Carle E. Davis, and D. French Slaughter, III, for the petitioners in docket No. 458-84. Diane E. H. Wilcox, for the petitioners in all other docket Nos. Stephen M. Friedberg, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: In these consolidated cases, respondent determined the following deficiences in, and additions to, petitioners' Federal income taxes: Additions to Tax
Docket No.
Taxable Year Ended
Deficiency
Sec. 6653(b) [2]
17890-81
December 31, 1977
$ 1,117.00
17891-81
December 31, 1977
18,215.00
17892-81
December 31, 1977
18,253.00
17893-81
December 31, 1977
17,854.00
10059-82
December 31, 1978
2,933.00
10060-82
December 31, 1978
3,072.00
10061-82
December 31, 1978
2,861.00
10062-82
June 30, 1978
1,557.80
458-84
December 31, 1977
17,182.00
$ 8,591.00
458-84
December 31, 1978
3,939.00
1,970.00
*351 The issues for decision are: [3]
(1) Whether a recision of a June 1, 1977, sale by Danville Apartment Associates occurred prior to the end of 1977. (2) Whether, if a recision did not occur in 1977, the actions of petitioner Charles D. Fox, III constitute fraud pursuant to sectin 6653(b). [4]
(3) Whether a $ 3,000 payment made by Danville Apartment Associates to Anthony Gacek in 1977 was a partnership distribution rather than the repayment of a loan. (4) Whether respondent properly determined the character and amounts to be included in petitioners' incomes *352 as a result of the personal use of corporate owned vehicles. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and attached exhibits are incorporated herein by this reference. At the time of the filing of their petitions, petitioners at docket Nos. 17890-81, 17892-81, 10060-82, and 458-84, resided in Roanoke, Virginia. At the time of the filing of the petitions at docket Nos. 17892-81 and 10059-82, petitioner Evelyn M. Leavitt resided in Charlottesville, Virginia, and Charles D. Fox, III, as co-executor for the estate of Daniel Leavitt, resided in Roanoke, Virginia. At the time of the filing the petitions at docket Nos. 17893-81 and 10061-82, petitioners W. A. Wirth and Verla Jo Wirth resided in Salem, Virginia. At the time of the filing of the petition at docket No. 10062-82, petitioner Valley Pathology Associates, Inc., had its principal office in Roanoke, Virginia. Danville Apartment Associates, Inc. (hereinafter the "Corporation"), a Virginia corporation, was formed September 13, 1971. The Corporation initially had four shareholders, Dr. Daniel Leavitt ("Leavitt"), Dr. Anthony Cuzzocrea ("Cuzzocrea"), Dr. Wolfgang Wirth ("Wirth") *353 and Charles D. Fox, III ("Fox"). Each of the four shareholders owned one share of stock. The three doctors constituted the board of directors, and Fox was the initial registered agent. On September 15, 1971, the Corporation executed a deed purchasing the Astor Arms Apartments. The deed was signed by Wirth as president, and Fox as secretary. As part of the purchase price, the deed provided for assumption of a mortgage in the original principal amount of $ 474,000. The four shareholders of the Corporation each signed an agreement whereby they personally and jointly guaranteed $ 200,000 of the mortgage. The Corporation was formed to hold title to the Astor Arms Apartments for a partnership to be made up of its shareholders. This was done to limit the liability of the shareholders to the amount of the indebtedness they had guaranteed. On October 1, 1971, a general partnership named Danville Apartment Associates (hereinafter the "Partnership") was formed. The four shareholders of the Corporation each had an equal interest in the Partnership. During July of 1975, Anthony Gacek ("Gacek") contributed $ 15,000 for an interest in the Partnership and stock ownership in the Corporation, *354 and loaned approximately $ 21,000 to the Partnership. Subsequent to Gacek's contribution and loan in July, 1975, he had Partnership and stock interests equal to those of the other four shareholders. Pursuant to an agreement dated May 27, 1977, the five individual shareholders sold their stock to Dodson Apartment Associates (hereinafter "Dodson Associates"), a general partnership. The sale was understood to be a sale of all interests in the assets of the Partnership, the Corporation, and the Astor Arms Apartments. Closing occurred on June 1, 1977, and the net proceeds from the sale were distributed soon afterwards to the five individual partners. Gacek received two payments, one in the amount of $ 15,000 and the other in the amount of $ 3,389.43, and the other partners each received $ 2,750. After the sale, one certificate representing the five shares of issued stock in the Corporation was issued to Dodson Associates. Dodson Associates' partnership agreement was executed by Paul Wayne Dodson (hereinafter sometimes "Dodson"), Paul H. Dodson, and by Paul Wayne Dodson as president of the Corporation. Paul Wayne Dodson's capital contribution to Dodson Associates was $ 34,360.71 *355 and Paul H. Dodson's capital contribution was $ 103,082.12. As a result, Paul H. Dodson had a 75 percent interest, and his son, Paul Wayne Dodson, had a 24 percent interest in Dodson Associates. The remaining 1 percent was given to the Corporation. The Dodsons and the Corporation were the only partners in Dodson Associates, which was formed for the purpose of buying Astor Arms Apartments. [5]
A completed sale to Dodson Associates occurred as set forth in the settlement statement and evidenced by the disbursement of funds paying off all outstanding as a return of capital the remaining amounts. However, because Dodson Associates purchased the stock of the Corporation, which held title to the Astor Arms Apartments, no new deed was recorded. On July 8, 1977, Fox returned the amount which had been charged at closing for recording the deed. On June 2, 1977, Fox notified Shields Brothers, Inc., the company *356 handling the day-to-day management of the Astor Arms Apartments, of the new ownership by Dodson Associates. Following the sale, and through 1980, Shields Brothers, Inc. continued to deal with Fox on routine matters and dealt with Paul Wayne Dodson on extraordinary repairs. Fox notified the mortgage holder bank, First Federal Saving and Loan Association, of the sale of the apartments to Dodson Associates. As a result of the sale, the bank released the original four partners from their individual personal guarantees of $ 200,000. The bank accepted as substitutes the personal guarantees of Paul H. Dodson and Paul Wayne Dodson in the same amount. As a part of the sale, the mortgage terms were renegotiated resulting in an even monthly payment of $ 4,000 by the Corporation, pursuant to the renegotiated obligation was made beginning July 14, 1977, and continued at least to January 17, 1980. Upon the sale of the apartments, the Corporation's short-term liabilities were paid in full. Following the sale, Paul Wayne Dodson and Fox guaranteed and/or endorsed the new short-term loans of the Corporation, and Paul Wayne Dodson was added as a signatory on the Corporation's checking account. *357 Almost immediately after the June 1, 1977 sale, Fox realized that there might be a significant tax problem due to depreciation recapture. Fox enlisted the aid of William E. Valentine ("Valentine"), a tax attorney, in order to determine whether there was a problem and, if so, to recommend solutions. Valentine confirmed that the sale would create a significant tax problem and advised Fox that if the sale were rescinded in the same tax year, the tax consequences would be nullified. In addition, Valentine advised that the purchaser could be brought into the Partnership as a new partner over a period of two years without causing a Partnership termination. Both Valentine and Fox were aware of the December 31, 1977 deadline for a recision, Fox had informed the partners, shortly after the sale, that there might be a problem and he instructed them to retain their shares of the distribution of the proceeds from the sale. Fox had a very close relationship with all of the principals. He had represented Leavitt and Wirth since the early 1960's, Cuzzocrea since the late 1960's, and Gacek since 1960. Fox had represented Paul H. Dodson since the early 1960's and, upon his death, Fox was *358 appointed executor of his estate. Fox began advising Paul Wayne Dodson in approximately 1975. All of the partners, prior to the sale in 1977, had delegated the authority to Fox to run the Partnership and had delegated him the authority to bind them on the actual sale and recision. [6]
In March 1978, Paul Wayne Dodson executed an agreement drafted by Valentine which stated that in return for approximately $ 136,374 contributed to the Partnership by Dodson in 1977, he was to receive a 46 percent interest in the Partnership from June 1, 1977 until June 30, 1978, when his interest would become 95 percent. Prior to that time, Dodson had been informed that the roofs at Astor Arms Apartments needed replacement. He believed that this agreement was executed because he could not use all of the tax benefits which would be produced by the roof replacement and that the original partners were willing to pay approximately $ 12,000 in exchange for a share of the losses. Dodson also believed that this would be accomplished without affecting *359 his ownership. The agreement, after being signed in triplicate by Dodson, was placed in the file in Fox's office and was never executed by the other parties to the transaction. The stock certificate previously issued to Dodson Associates was not revoked or withdrawn after Dodson's execution of the March 1978 agreement, and no new stock certificates were issued. Each of the partners, other than Gacek, repaid the amounts they had received as distributions from the June 1, 1977 sale sometime between April 12, 1978 and June 20, 1978. Each of these partners also made contributions to the Partnership equal to one-half of their tax savings generated from their claimed losses from the Partnership. The Partnership returns for 1977, 1978, and 1979, including the Schedules K-1 for each of the partners, were prepared by Valentine. All of the partners, including Dodson, used the Schedules K-1 prepared by Valentine in reporting their shares of the Partnership's income and expenses for 1977 through 1979. Gacek did not rejoin the Partnership and did not participate in ownership of the Astor Arms Apartments after the June 1, 1977 sale. On his Federal income tax return, Form 1040, for 1977, *360 Gacek reported the sale in June 1977 of his interest in the Partnership. Gacek reported the sale in June 1977 of his interest in the Partnership. Gacek's 1977 return was signed as prepared by Fox's law firm. Petitioners Leavitt, Wirth and Cuzzocrea were shareholder-employees of Valley Pathology Associates, Inc. (hereinafter "Valley Pathology"). As a result of their having a main office at one hospital, doing consulting work at other hospitals, and maintaining a private laboratory, they were engaged in substantial business travel. Valley Pathhology provided automobiles for use by the doctors. During 1978, Leavitt, Wirth, and Cuzzocrea each paid $ 20 per month to Valley Pathology, by means of a deduction from their wages, as reimbursement for persoonal use of automobiles provided by Valley Pathology. OPINION 1. Recision Agreement
The first issue for our consideration is whether the sale of Astor Arms Apartments by the Partnership was rescinded prior to the end of 1977. The parties agree that if a recision occurred in 1977, its effect would be to nullify the tax impact of the June 1977 sale. Petitioners contend that, although there is a lack of tangible physical evidence *361 relating to a recision in 1977, the testimony given at trial and the written agreement executed in March 1978, demonstrate that Fox and Dodson agreed to a recision on December 29, 1977. Petitioners also contend that Fox had the authority to bind the other partners to a recision. Conversely, respondent contends that the evidence clearly demonstrates that a recision was never entered into or, alternatively, if a recision did occur, that it occurred in 1978. Because we agree that the evidence in this case strongly indicates that no recision occurred in 1977, we hold for respondent on this issue. Petitioners allege, and Fox testified, that the recision agreement was orally entered into during a four hour meeting between Fox and Dodson on December 29, 1977. Petitioners also allege that the time sheets for Fox's law firm corroborate that a meeting took place on this date between Fox and Dodson. Fox testified that Dodson had not given his assent to the recision prior to the alleged meeting but that, after discussing the terms of the recision in some detail, Dodson did give his assent. Dodson, however, testified that no such agreement was entered into on that date or at any other *362 date. Fox also testified that he reviewed the firm's time sheets in order to determine when the meeting took place. A four hour block is shown on the time sheet for December 29, 1977, and the client being charged is designated as "Dodson." Each of Fox's time sheet entries, however, includes a service code which indicates what occurred during the time charged to the client. The service code entered for the four hours in question is "CR." At trial, Fox testified that "CR" stood for research, while the service codes "M", "CI", and "CO" represented meetings and conferences. The only evidence offered which supports a finding that a recision did occur in 1977 is Fox's self-serving testimony. Against this is the lack of any documented evidence of a 1977 recision agreement, Dodson's testimony that a recision agreement did not occur, and the time sheets of Fox's law firm, which show that the period during which Fox allegedly met with Dodson was actually charged to Dodson for research. The agreement signed by Dodson in March 1978, was a single typed page which purported to characterize the June 1, 1977 transaction as one in which Dodson joined the Partnership. Dodson's interest in *363 the partnership was to be 46 percent from June 1, 1977 through June 30, 1978, and 95 percent thereafter. The agreement did not state that it was recharacterizing a transaction which was previously a sale, nor did it state that it was the memorialization of a previous oral agreement. The agreement was undated as to month and day, but listed the year of its making as 1978. Petitioners have presented no documentation, notes or draft agreements prepared prior to the agreement signed by Dodson in March 1978, which evidences an earlier recision agreement. Under the circumstances of this case, we find it very difficult to accept the proposition that Fox, an experienced attorney, would fail to make any documentation in 1977 of a recision agreement entered into in that year. Such an agreement would impact the existence and ownership of two partnerships and the ownership of a corporation holding legal title to real property subject to a mortgage in the amount of $ 474,000 to which $ 200,000 of personally guaranteed liability was attached. The complexity of such an agreement was further increased by Gacek choosing not to reenter the Partnership and by the death of Dodson's father, who *364 owned 75 percent of the purchasing partnership in June 1977, prior to the alleged December 29, 1977 recision. Petitioners admit that the sole purpose behind the recision was to nullify the Federal Tax consequences of the sale and that Fox was fully aware that to achieve this result the recision agreement had to be effected in 1977. With this in mind, we find it impossible to comprehend why, if Dodson did assent to a recision in 1977, Fox would have failed to create some type of documentation with which to substantiate the agreement. In sum, we find that a recision agreement was not entered into in 1977. Accordingly, we find for respondent on this issue. 2. Fraud
The second issue for decision is whether the actions of petitioner Charles D. Fox, III constitute fraud pursuant to section 6653(b). Section 6653(b) imposes an addition to tax if any part of an underpayment of tax is due to fraud. Respondent bears the burden proving fraud by clear and convincing evidence. Section 7454(a); Rule 142(b); [7]Otsuki v. Commissioner,53 T.C. 96, 105 (1969). Respondent *365 must show that the taxpayer intedned to evade taxes which he knew or believed that he owned, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Webb v. Commissioner,394 F.2d 366, 377-378, (5th Cir. 1968), affg. a Memorandum Opinion of the Court; Acker v. Commissioner,26 T.C. 107, 111-112 (1956). The elements to be established are (1) an underpayment of tax, [8] and (2) that some part of this underpayment was due to fraud. Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court. The existence of fraud is a factual question to be determined by an examination of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). *366 Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92, (1970). Fraud may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. Stone v. Commissioner,56 T.C. 211, 223-224 (1971); Otsuki v. Commissioner, supra at 105-106. Here petitioners admit that Fox was knowledgeable with respect to the necessity that a recision occur during 1977 in order for the tax impact of the June 1977 sale to be nullified. Fox treated the sale as nullified by a recision in 1977. Therefore, if respondent has demonstrated by clear and convincing evidence that a recision did not occur in 1977, we believe that respondent has satisfied his burden of showing Fox's intent to evade a tax which he knew to be owing, by conduct intended to prevent the collection of such tax. The parties have litigated the issue of whether a recision was entered into in 1977. Petitioner have not met their burden of proving that a recision occurred in 1977, even though an agreement was entered into in March 1978 which purported to characterize the transaction as other than a sale from the time of its *367 original consumation. We also reach this result even though there is some evidence that a sale from the time of its original consumation. We also reach this result even though there is some evidence that petitioners discussed in 1977 the opportunity to avoid recapture by entering into a recision in 1977 and that they desired and possibly intended to take advantage of such an opportunity. The question of fraud, however, turns on whether petitioner Fox believed that a recision had occurred in 1977 at the time he reported the transaction in 1978. This in turn depends predominantly upon the events which occurred at the end of 1977, particularly the events of December 29, 1977. Based on the record before us, we cannot say that either party has clearly established whether a meeting occurred on December 29, 1977, between Fox and Dodson. If such a meeting did occur, Fox may have believed that a recision had been orally entered into at such a meeting. While we believe this to be unlikely, we cannot say that there is clear and convincing evidence to the contrary. Accordingly, we find that petitioner Fox is not liable for the additions to tax for fraud as determined by respondent. *368 3. Partnership Payment to Gacek
The third issue for decision is whether a $ 3,000 payment made by the Partnership to Gacek in 1977 was a distribution rather than the repayment of a loan. Petitioners contend that the payments made by the Partnership to Gacek of $ 15,000 and $ 3,389.43 represent a Partnership distribution and a repayment of a loan, with accrued interest, respectively. Petitioners point out that Gacek, upon entering the Partnership in 1975, contributed $ 15,000 to the Partnership and loaned $ 21,000 to the Partnership. Petitioners also point out that in the notice of deficiency issued to Gacek, respondent treated $ 389 of the $ 3,389.43 as interest income. Petitioners argue that based on the above facts, $ 3,000 of the amount was a repayment of principal, while $ 389 was accrued interest (rounded to the nearest dollar). Respondent alleges only that petitioners have failed to prove that the $ 3,000 was the repayment for principal on the loan. Valentine testified that each of the partners received a distribution in 1977 based on his capital account and that Gacek's distribution was different in amount because he had entered the Partnership later than *369 the other partners and had a capital account which was different in amount. Valentine also testified that in addition to the distribution, Gacek received a payment for a loan with which the other partners to receive a second payment from the Partnership, a portion of which was treated as interest, is sufficient to establish that the payment in issue was a repayment of Gacek's outstanding loan. Accordingly, we hold that Gacek is entitled to treat the $ 3,000 in issue as a return of principal. 4. Constructive Dividends
The final issue to be decided is the character and amount of income resulting from the personal use by the doctors who were its shareholder-employees of vehicles owned by Valley Pathology. The character of such income determines whether such amounts are deductible by Valley Pathology. Petitioners have conceded that respondent properly determined the percentage of personal use of the automobiles provided each of the doctors. Petitioners allege, however, that respondent erred in determining that unreimbursed personal use of the automobiles resulted in constructive dividends rather than additional compensation. Petitioners also contend that the amount the *370 doctors are required to include in income is equal to the expenses incurred by the corporation in maintaining the automobiles, including depreciation, as opposed to the fair rental value of the automobiles, including depreciation, as opposed to the fair rental value of the automobiles. Petitioners have not asserted that respondent erred in determining the fair rental value of the automobiles. In cases where corporate property has been used by shareholder-employees for their personal benefit, we have consistently held that such shareholder-employees are to be treated as receiving constructive dividends unless the taxpayer can demonstrate that such personal use is intended as additional compensation or in some other way is approximately related to the corporate business. Falsetti v. Commissioner,85 T.C. 332, 356 (1985); Henry Schwartz Corp. v. Commissioner,60 T.C. 728, 744 (1973); Challenge Mfg. Co. v. Commissioner,37 T.C. 650, 663 (1962). [9] Petitioners attempt to distinguish their case from those cited above on two grounds: (1) the *371 automobiles used by the doctors in these cases were used extensively for business purposes; and (2) as a corporate policy the doctors were required to pay reimbursement to the corporation for the personal use off the automobiles. In both Falsetti and Henry Schwartz Corp., a substantial percentage of the use of the automobile owned by the corporation was for business purposes. We nonetheless held that the benefits derived from the personal use of the automobiles were constructive dividends. Falsetti v. Commissioner, supra at 358; Henry Schwartz Corp. v. Commissioner, supra at 744. Here also, we do not believe that the percent of business use of the automobile is relevant to the characterization of the benefits resulting from the corporation making such property available for the personal use of its shareholder-employees. Petitioners' second attempt at distinguishing our previous cases is based on the fact that each of the doctors paid $ 20 per month to Valley Pathology, *372 by means of a deduction from their wages, as reimbursement for their personal use of the automobiles. The amount of the payment was $ 20 per month regardless of the amount the payor-doctor used the automobile for personal purposes. Cuzzocrea testified that this policy was adopted so that Valley Pathology would get a deduction for the automobiles. We do not believe that a "reimbursement" policy which bears no relationship to the amount of personal use of corporate property, and which was apparently adopted for tax purposes, tends to demonstrate that the providing of such property for personal use was intended to be additional compensation. Such payments do not distinguish these cases from our previous cases. Accordingly, we hold that the benefits derived from the personal use of automobiles provided by Valley Pathology to the doctors constitute constructive dividends. Such dividends must be included in income by the doctors and are not deductible by Valley Pathology. Also in dispute is the amount of dividend income to be included by the doctors. Petitioners assert that the amount to be included should be based on the expenses incurred by Valley Pathology in maintaining the *373 automobiles. Respondent determined that the amount should be based on the fair rental value of the automobiles. Section 301 states that a dividend shall be included in gross income and that, with respect to a noncorporate shareholder, the amount to be included is the amount of money received, plus the fair market value of any other property received. In Falsetti v. Commissioner, supra at 356, we stated: It is well established that where corporate property is used by a shareholder or member of his family for personal purposes, not proximately related to the corporate business, the corporation is not entitled to deductions to the extent that they relate to such personal use, and the fair rental value of such property is includible in the shareholder's income as constructive dividends to the extent of the corporation's earnings and profits. * * * [Emphasis added.] In both Henry Schwartz Corp. and Challenge Mfg. Co., we held that the amount to be included in *374 the income of the shareholders was equal to the deductions disallowed the corporation as a result of the personal use by shareholders of corporate property. In Challenge Mfg. Co., however, we stated only that "there is no convincing evidence before us establishing that the benefits conferred upon [the shareholder] had a fair value less than the amounts (including depreciation) properly disallowed to the corporation." 37 T.C. at 663. In Henry Schwartz Corp., respondent asserted amounts to be included in the income of the taxpayers therein based upon the amounts of depreciation disallowed the corporation and we stated that such a measure was applicable because, "in our judgment, it may reasonably be regarded as the fair market value of [the] personal beneficial use of corporate property." 60 T.C. at 744. We do not view those cases as altering the general rule, as set out in Falsetti, that the proper measure of such inclusion should be the fair rental value of the property the use of which was provided to the shareholders. We believe that the holdings in those cases were solely the product of the records presented to the Court therein. In *375 these cases respondent has determined a fair rental value for the use of the corporate property and petitioners have not challenged such value. Accordingly, we hold that the amount which petitioners must include in income as a result of their personal use of corporate property is such property's fair rental value as determined by respondent. Decision will be entered pursuant to Rule 155 in docket No. 17890-81.
Decisions will be entered for respondent in docket Nos. 17891-81, 17892-81, 17893-81, 10059-82, 10060-82, 10061-82, 10062-82.
Decision will be entered for petitioner in docket No. 458-84.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Anthony D. Cuzzocrea and Marjorie Cuzzocrea, docket No. 17891-82; Estate of Daniel Leavitt, Deceased, Charles D. Fox, III, Co-Executor, and Evelyn M. Leavitt, Deceased, Charles D. Fox, III, Executor, docket Nos. 17892-81, 10059-82; Estate of W. A. Wirth, Deceased, Dominion Trust Company, Executor, and Verla Jo Wirth, docket Nos. 17893-81, 10061-82; Valley Pathology Associates, Inc., docket No. 10062-82; and Charles D. Fox, III, and Preston W. Fox, docket No. 458-84. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
3. In the petition at docket No. 10060-82, the petitioner also raised as an issue the disallowance of an equipment expense. This issue was not pursued, however, at trial or on brief. We will therefore treat the issue as conceded by petitioners. Rule 142(a)↩; Tax Court Rules of Practice and Procedure. 4. Respondent's notice of deficiency as to petitioner Charles D. Fox, III was issued after the normal 3 year statute of limitatin on assessment had expired. Sec. 6501(a). Assessment of any deficiency with respect to petitioner Fox is therefore barred unless we find that he has committed fraud. Sec. 6501(c)(1). ↩
5. Paul H. Dodson died in October, 1977. In November 1977, Paul Wayne Dodson purchased Paul H. Dodson's interest in Dodson Associates pursuant to a prearranged buy/sell agreement. In making this purchase, Paul Wayne Dodson executed a term note in the amount of $ 103,082.12. ↩
6. Petitioner Gacek, however, chose not to participate in the recision because the sale did not impact him to the same extent as the other partners. ↩
7. Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
8. As relevant to this case, sec. 6653 (c)(1) defines "underpayment" for purposes of sec. 6653↩ as a "deficiency" as defined in sec. 6211. 9. See also ON-RI-GA Medical Professional Association v. Commissioner,T.C. Memo. 1978-183; Olson v. Commissioner,T.C. Memo. 1958-56↩.