T.C. Memo. 1996-151


UNITED STATES TAX COURT


NATIONAL INDUSTRIAL INVESTORS, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No.  24863-93.                    Filed March 26, 1996.


     <u>Held</u>:  P's miscellaneous deductions redetermined;
<u>held</u>, <u>further</u>, for any underpayment due to denied
deductions P is liable for penalties under sec.
6662(a), I.R.C., for 1989 and 1990; <u>held</u>, <u>further</u>, for
any underpayment due to unreported income P is not
liable for penalties under sec. 6662(a), I.R.C., for
1990.


<u>Donald Del Grande</u>, for petitioner.

<u>Elaine L. Sierra</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

NIMS, Judge: Respondent determined the following deficiencies and penalties in respect of petitioner's Federal income taxes:

| Taxable Year | Deficiency | Sec. 6662(a) Penalty |
|---|---|---|
| 1989 | $12,284 | $2,457 |
| 1990 | 12,251 | 2,450 |

Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

By amended pleadings, respondent asserted an increased 1990 income tax deficiency in the amount of $88,162, and an increased 1990 penalty under section 6662(a) in the amount of $17,632. The parties settled the increased 1990 income tax deficiency, but the additionally asserted penalty remains disputed. Petitioner has also claimed increased deductions for automobile mileage for both years and for dues and subscription expenses for 1990.

After concessions, the issues for decision are:

(1) How much is petitioner entitled to deduct for business expenses for 1989 and 1990? After concessions and additional claims by petitioner the following amounts are in contention:

| Category of deduction | 1989 | 1990 |
|---|---|---|
| Depreciation ................... | $13,367.00 | $13,180.00 |
| Net operating loss carryover... | 231,102.00 | 266,331.00 |
| Interest....................... | 19,010.46 | 20,236.32 |
| Repairs........................ | 123.00 | 300.00 |
| Rents.......................... | 940.00 | 850.00 |
| Fees and expenses of C.M. Byrne III | 276.72 | 500.00 |
| Management fees of Charles Byrne | 500.00 | 4,156.30 |
| Insurance...................... | 4,084.00 | 2,353.00 |
| Office expenses................ | 489.80 | 72.80 |
| Telephone...................... | 1,028.00 | 2,173.00 |
| Auto........................... | 2,318.63 | 3,285.36 |
| Travel......................... | 166.00 | -0- |
| Professional services......... | 370.00 | -0- |
| Dues and subscriptions........ | 158.00 | 157.60 |

(2)  Is petitioner liable for the accuracy-related penalty for negligence under section 6662(a) in the amounts of $2,457.00 and $17,632.00 for 1989 and 1990, respectively?

Some of the facts have been stipulated and are found accordingly.  The stipulation of facts and attached exhibits are incorporated herein by this reference.

## FINDINGS OF FACT

Petitioner, National Industrial Investors, Inc. (NII), is a California corporation.  Since its inception, its principal place of business, office address, and office address of all of its subsidiaries has been 956 Jackling Drive, Hillsborough, California, the residence of Charles M. Byrne (Byrne).

Byrne owned 51 percent of the stock of NII from 1972, shortly after NII's incorporation, until 1980, when he divided his interest among his wife and children.  A non-Byrne minority shareholder, McMahon, was bought out in early 1988, and when

Byrne's wife died on July 28, 1988, Frances E. Byrne Jr. (Frances) and Kimberly Byrne, Byrne's daughters, became NII's sole shareholders.

Byrne has been a director of NII during most of its existence, including the years in issue. He was also its president from 1971 until he resigned on October 9, 1982, and its vice president during the years in issue. After resigning as president of NII, his daughter, Frances, succeeded him. His wife was secretary of the corporation until her death. During 1989 and 1990, NII paid no employee compensation.

Respondent's notice of deficiency denies all of petitioner's deductions for 1989 and 1990. Part of petitioner's net operating loss carryover deductions come from depreciation, interest, and other deductions incurred in prior years and in part from the losses of petitioner's subsidiaries incurred in those years. Establishing the net operating loss, therefore, requires substantiating the deductions incurred by petitioner's subsidiaries from as far back as 1975 and demonstrating their business purpose. Establishing the amount of depreciation on a building owned by petitioner requires substantiating its original unadjusted basis in 1971. Interest deductions claimed by petitioner relate to five different notes secured by petitioner's building from time to time since 1971.

Over the years NII has had four subsidiaries engaged in various businesses, but its primary asset and source of income has always been its building on Senter Road in San Jose, California (the Burke Building). The original owner of the building, Parr Properties (Parr), an industrial real estate developer, leased the building to Burke Rubber Company (Burke) on May 10, 1968, and later, in April of 1969, borrowed $310,000 from Teachers Insurance & Annuity Association of America (TIAA) against both the building and the lease. Shortly thereafter, Parr liquidated all of its assets, including disposition of the Burke Building.

Before that time, Byrne had worked for Parr for approximately 20 years, and at the time of the liquidation, he was an executive vice-president and industrial director of Parr. When Parr sold off its assets, Byrne and a group of investors bought the Burke Building.

Parr's board of directors approved the sale, but suggested that Byrne not participate as a partner in the venture until after Parr had liquidated so as to avoid the appearance of self-dealing on his part. Consequently, Byrne devised an alternative plan.

Byrne lent his brother-in-law, Hugh McMahon, Jr., (McMahon), money to invest in Senter Associates, the partnership acquiring the Burke Building. With this loan and his own funds,

McMahon purchased a 50-percent interest in Senter Associates. When Byrne stopped working for Parr, McMahon repaid the debt by transferring half of his interest in Senter Associates to Byrne. Parr knew of this arrangement.

Parr sold the Burke Building, along with the lease, to Senter Associates sometime before July 10, 1970. The sole consideration was the assumption by Senter Associates of the TIAA encumbering liability, which at the time of acquisition had a remaining principal balance of $304,271.63.

In August of 1971, Senter Associates and Burke entered into a second lease (the Burke Lease), which superseded the original lease negotiated by Parr. The Burke Lease provided for the construction of a 34,000 square foot addition to the Burke Building (the Addition) and for a corresponding increase in rent. The lease guaranteed an annual rent, starting at $65,250 and increasing over time. Senter Associates purchased land for the Addition from Burke for $21,600 on September 22, 1971.

Shortly before the Addition was completed and paid for, Senter Associates incorporated and on December 18, 1971, became NII. The partners contributed all the assets of Senter Associates to NII, which also assumed all of the liabilities of Senter Associates. In return the partners, including Byrne, each received 500 shares of NII stock and a corporate note for

approximately $2,900. After its incorporation, NII paid $167,186 to build the Addition.

Petitioner placed both the Burke Building and the Addition (the Burke Property) in service on January 1, 1972, the date that Burke took possession of the Addition. For the Burke Building, NII has always used the straightline method of depreciation in conjunction with a useful life of 28-1/2 years. For the Addition, it has used the 125-percent declining balance method with a useful life of 30 years.

Within a month after paying for the Addition, on January 31, 1972, petitioner borrowed an additional $202,918.92 against the Burke Property from TIAA. Petitioner consolidated this loan and the previous loan from TIAA into one $500,000 loan (the TIAA Loan). Starting on March 1, 1972, the consolidated note required monthly payments of interest and principal of $4,238.87. The interest rate on the consolidated loan was 9-1/8 percent per annum.

The Burke Property also secured other loans in later years. For example, the property secured a $75,000 loan from a group of investors (Investor Group Loan) from June 10, 1982, until October 29, 1985. On September 27, 1985, Owens Financial Group, Inc., lent petitioner $85,000 (Owens Loan). The Owens Loan was collateralized by the Burke Property. Petitioner repaid the

Owens Loan when it refinanced the property on March 4, 1988.  At
that time, the principal balance of the loan was $86,181.50.

Petitioner issued another obligation against the property in
1988 to settle a shareholder derivative suit (the McMahon
Litigation).  On August 17, 1984, McMahon, a minority
shareholder, instituted a suit against petitioner, all other
shareholders, and Byrne.  McMahon alleged, among other things,
that Byrne unilaterally appointed his own family as officers and
directors, that the Byrne family caused NII to purchase three
subsidiary corporations without informing McMahon, that the
family diverted money from petitioner to the subsidiaries for the
purpose of paying salaries and stipends to the family, and that
the family's behavior generally constituted self-dealing and
breach of fiduciary duty.  The parties pursued the litigation
from August 1984 through March 1988.

The litigation essentially ended on October 29, 1987, when
Judge Thomas Smith imposed sanctions after several attempts by
McMahon's lawyer, Jones, to enjoin the corporation from carrying
on its business.  Judge Smith explained the sanctions, stating:

> It appears to the court that your conduct and your
> client's conduct in this case, Mr. Jones, is reprehensible,
> to say the least.
>
>     \*    \*    \*    \*    \*    \*    \*
>
> There is no factual basis; there is no legal basis for
> your continuing to proceed in this case.  What you're doing
> is, quite simply, harassing the other side and I'm tired of
> it, and if you won't stop doing it on your own account, then

I'm going to make you start paying for it, and you're going to be paying the side who has to pay attorney's fees, because you're not practicing the law the way you should be.

The parties subsequently settled. The agreement required McMahon to relinquish any interest in NII and the Burke Building. In return, it required petitioner and the other named defendants to pay McMahon the sum of $32,500 and also required petitioner to issue a $252,500 note to McMahon and his wife (McMahon Note).

The McMahon Note provided for 7-percent interest per annum compounded annually starting on January 1, 1988, with any unpaid principal and interest due and payable on December 31, 1997. If the Burke Property were to be sold, however, the note would become immediately due and payable. The note was nonrecourse and, because a first mortgage holder with a superior claim to the property already existed, was secured by a second deed of trust.

Around the time petitioner settled the McMahon litigation, it was trying to refinance the Burke Property and also exchange it under section 1031 for another piece of property. Both of these transactions might have replaced the current first mortgage holder with another. Consequently, as part of the settlement agreement, petitioner negotiated for and received a subordination agreement. The agreement provided that, so long as the amount of the first mortgage did not increase, petitioner could refinance or enter into a section 1031 exchange without a "sale" occurring,

and the McMahon Note, therefore, would not become immediately due and payable.

On March 4, 1988, petitioner refinanced the Burke Property. Petitioner borrowed $475,000 from San Francisco Federal Savings (San Francisco Loan) and paid off the remaining $323,731.51 balance of the TIAA Loan and the Owen's Financial Loan, the remaining balance of which was $86,181.50. Respondent has conceded that petitioner was entitled to deduct the interest on the San Francisco Loan in 1989 and 1990. But the 1988 interest, which substantially contributed to petitioner's net operating loss for that year, has not been conceded to be deductible.

The San Francisco Loan required petitioner to pay $3,994.06 interest and principal monthly, beginning on April 1, 1988, and continuing every month thereafter for 12 months. Afterward, the note established a new monthly payment for the next 12 months depending upon market interest rates. The total of the payments required in 1988 was $35,946.54.

The interest rate of the loan was fixed at 9.5 percent for the first 6 months of the loan. After that, the interest rate varied from month-to-month in accordance with current market interest rates. As of the end of 1988, the interest rate on the San Francisco Loan had increased to 11.307 percent.

As previously stated, petitioner controlled several subsidiaries over the years. These were Controlled Casting

Systems Corp. (Controlled Casting), National For Sale by Owner

Realty Corp. (Sale By Owner), National Industrial Management

Corporation (Industrial Management), and Far Western Real Estate

Corp. (Far Western).  For the years for which petitioner's

returns show consolidated losses, the separate gains and losses

of petitioner and its subsidiaries are as follows:

| Year | Total Loss | NII | Controlled Casting | Industrial Management | Sale By Owner | Far Western |
|------|-----------|-----|--------------------|-----------------------|---------------|-------------|
| 1989 | ($35,229) | ($35,229) | * | * | * | * |
| 1988 | (32,766) | (32,716) | * | * | * | (50) |
| 1985 | (46,115) | (41,602) | * | (3,995) | (408) | (110) |
| 1984 | (35,992) | (4,814) | * | (11,594) | 3,722 | (23,306) |
| 1983 | (38,514) | 7,188 | * | (13,821) | (5,232) | (26,949) |
| 1982 | (47,378) | (25,720) | * | (1,709) | (19,949) | * |
| 1978 | (40,328) | (2,565) | * | (37,763) | * | * |
| 1976 | (19,941) | (36,113) | (486) | 16,658 | * | * |

* represent years in which petitioner's consolidated return did not include the subsidiary.

Controlled Casting emerged from an arrangement between

Sears, an inventor, and Shell Chemical Company (Shell).  They

sought to develop a new type of foundry equipment, which, by

injecting sand with a resin-type material, could form the mixture

into molds.  Sears and Shell agreed that if Shell would develop

the resin and give Sears a 10-year license, then he, in turn,

would design the machine.  Shell subsequently formulated the

resin from benzene, a petroleum derivative.

Sears incorporated Controlled Casting and, in 1973, sold 80

percent of its stock to petitioner.  Not only did Controlled

Casting design the machine, but it also manufactured several of

them and sold two to General Motors.  However, shortly

thereafter, OPEC cut off the United States' supply of benzene, and in 1974 Shell stopped producing the resin. With "no relief in sight", petitioner liquidated the subsidiary in 1976.

Industrial Management, another 80-percent subsidiary, provided real estate expertise to clients. It acquired and developed property, designed buildings, found financing, and, if necessary, dealt with related government legislation.

Far Western, a wholly owned subsidiary, operated a real estate brokerage business. When petitioner formed Far Western, Hugh McMahon III (Hugh) provided the necessary brokerage license required by the California Department of Real Estate. Far Western operated actively from 1983 until 1985, but Far Western never generated any taxable income. The only gross income reported for Far Western was $2,031 in 1984.

Petitioner's other wholly owned subsidiary, Sale By Owner, experimented with an alternative real estate brokerage business. For a $290 fee, a homeowner selling his own home could list his house on the multiple listing service without engaging an exclusive real estate agent. But, if a broker found a buyer, the homeowner could use the broker and pay his fee.

Byrne, his wife, and Hugh incorporated Sale By Owner on April 15, 1982, and obtained a corporate broker's license from the Department of Real Estate, using Hugh's brokerage license.

Hugh had sold real estate in San Diego before and believed that the city was a good test market.  Sale By Owner opened there.

Almost immediately the business had problems.  As an advance-fee broker the Department of Real Estate had to preapprove all of its advertising.  The time lag destroyed Sale By Owner's marketing agility.  Furthermore, and perhaps more importantly, few homeowners in San Diego wanted the service.  The office in San Diego closed in November of 1982, and Sale By Owner moved to the Palm Springs-Rancho Mirage area (Desert Area), a resort market with seasonal buying patterns.  Hugh, who was "broke" at this point, quit the project.

The experiment continued in the Desert Area, using Hugh's corporate brokerage license, and began to turn a profit early in 1984.  However, in the same year, both Far Western and Sale By Owner abruptly collapsed.  In August of that year, Hugh's membership with the Board of Realtors and the Multiple Listing Service for the Desert Area, which both subsidiaries used, was canceled.  Hugh's father, McMahon, in that same month, instigated the McMahon Litigation.  As a consequence of the impending litigation, Far Western and Sale By Owner were not able to find another corporate broker and failed to participate in the 1984-1985 selling season in the Desert Area.  Furthermore, the suit consumed much of the time of petitioner's management.  By 1985, both subsidiaries had ceased operations.

The parties settled the McMahon Litigation in 1988, and in October of 1989, petitioner destroyed most of the underlying documentation for its expenses from 1971 to 1984 or 1985. Petitioner's management considered them old and irrelevant. But it kept the checks for Sale By Owner and Far Western, reasoning that those expenses were "more current". Petitioner also kept its unaudited books of original entry, and other books based on them. Since 1976, the first contested loss year, a member of the Byrne family has kept the books of original entry. An accountant compiled some of the other ledgers and journals using the information the Byrnes gave him.

While prior years' events generate petitioner's claimed net operating losses, including depreciation and interest, the events of 1989 and 1990 generate petitioner's other claimed deductions. Respondent conceded some of these current deductions, and of the amounts remaining in controversy, respondent has admitted that petitioner has substantiated the following amounts:

| Category | 1989 | 1990 |
|---|---|---|
| Management fees of Byrne......... | $500.00 | $3,656.30 |
| Fees/expenses of Charles Byrne III... | 276.72 | 500.00 |
| Repairs................................ | 123.14 | 299.57 |
| Insurance | | |
| for Automobile.................. | 795.80 | 661.60 |
| on Byrne's Life................ | 1,114.10 | -0- |
| Telephone............................. | 905.39 | 1,864.15 |
| Travel................................ | 48.77 | -0- |
| Dues and subscriptions | | |
| Newspapers....................... | 40.00 | 92.60 |
| SF Commercial Club.............. | 75.17 | 65.00 |
| Office expenses | | |

| | | |
|---|---|---|
| Debris box....................... | 410.00 | -0- |
| Spellmaster...................... | 79.80 | -0- |
| Secretary of State of Colorado.... | -0- | 5.00 |
| Riverside County Clerk's Office... | -0- | 67.80 |
| Rents................................ | 940.00 | 850.00 |

After the settlement of the McMahon Litigation, petitioner turned its attention to other matters. Frances and her sister, Kimberly, had become NII's sole shareholders, and they wanted to manage property as well as own it. They sought to swap the Burke Property under section 1031 for an office building, an apartment building, or a strip mall. Finding the right swap property, however, proved difficult.

On November 18, 1987, almost directly after Judge Smith imposed sanctions in the McMahon Litigation, NII by written contract hired Byrne as a consultant, paying him $500 per month plus reimbursement for car mileage. NII wanted his experience. Moreover, at the time, Byrne worked for First Interstate Bank of CA as the manager of special real estate assets. Through this position he had contacts with others in the real estate industry who might know of a suitable property for exchange. Furthermore, by this time Byrne had acquired a real estate brokerage license.

In addition to requiring Byrne to give advice, the consulting contract required him to inspect the Burke Property and to seek out a section 1031 exchange property. Inspecting the Burke Property required about 2 days' effort twice a year. But the quest for exchange property took longer: it required finding

a property, inspecting it, and negotiating with the owner. Byrne scoured California, searching for a suitable exchange property. His mileage logs for 1989 and 1990 detail his trips to at least 19 different properties.

In his search, Byrne drove two cars: A 1978 Chevrolet Malibu (Malibu) owned by Frances and a 1977 Mercury Cougar (Cougar) owned by NII. Byrne kept detailed mileage logs when he drove the Malibu. Petitioner claims that Byrne drove the Malibu 10,305 miles in 1989, and 12,636 miles in 1990. Petitioner reimbursed Byrne for his mileage by issuing him notes, payable on or before December 31, 1997. The note for 1989 was for $2,318.63 (10,305 miles at 22.5 cents per mile). The note for 1990 was for $3,285.36 (12,636 miles at 26 cents per mile).

The Malibu's 1990 mileage logs, however, are inaccurate. Imbedded in the Malibu's logs were the Cougar's mileage logs for June, July, and August of 1990. Moreover, some of the 1990 Malibu mileage logs that petitioner refers to in its summary mileage calculation are not in evidence. After deducting these miles, the Malibu's mileage logs indicate that Byrne drove the Malibu 7,523 miles in 1990.

Except for the "imbedded" mileage logs, Byrne kept no Cougar mileage logs. Petitioner claimed deductions only for the Cougar's repairs and insurance.

In addition to Byrne's consulting agreement, petitioner also asked Byrne's son, Charles M. Byrne, III, (Charles) to occasionally inspect prospective exchange property. Petitioner also subscribed to two Northern California newspapers that Charles collected and sent to Byrne or Frances, who searched in the papers' real estate and business sections for an exchange property. Ultimately, petitioner failed to find a suitable exchange property. The value of the Burke Property declined as the 1997 termination of the Burke Lease approached. In 1991, with only 5 years left on the lease, interest in the Burke Property vanished. Petitioner stopped searching for a swap property in late 1991.

Petitioner had other normal operating expenses during 1989 and 1990, including a separate phone line at Byrne's residence, used exclusively for business, and a Spellmaster for Frances because she was "an atrocious speller". Petitioner also paid part of the premium on Byrne's life insurance, asserting that it was "key man insurance". As of 1988 NII was a 40-percent beneficiary under the policy.

Petitioner also rented a storage space in Rancho Mirage during 1989 and 1990. Petitioner stored brochures about Far Western's services, and homeowner kits produced for Sale By Owner, which provide how-to-sell-your-own-home information to

customers.  Petitioner stored this material until 1993, when it abandoned hope of reviving the two subsidiaries.

The additional penalty asserted by respondent revolves around services performed by Far Western for International Marketing Limited (IML) sometime in the mid-1980s.  On December 28, 1989, after petitioner had liquidated Far Western, petitioner sent IML a bill for $57,100.  As payment IML gave petitioner a parcel of land, known as Lot 51.  To offset the value of Lot 51, petitioner issued IML a note for $38,000.

Although petitioner and its subsidiaries were accrual method taxpayers, they failed to include in income the amount due for services performed for IML.  Petitioner concedes that Lot 51 had a fair market value of $150,000, and concedes $112,000 of services income for 1990.

OPINION

Respondent's primary contention is that there was no business purpose for petitioner's deductions.  Respondent claims that petitioner deducted personal expenses of the Byrnes.  Respondent also asserts lack of substantiation in many instances. Because respondent contends that petitioner deducted personal expenses, failed to report services income, and failed to maintain adequate records, she also asserts negligence.

Petitioner replies that it deducted only business expenses that are substantiated by petitioner's books and in some cases by

underlying documentation.  Petitioner concedes that it had unreported service income, but denies that its failure to report it was negligent.

When a taxpayer contests the Commissioner's determination, the burden of proof is ordinarily on the taxpayer to show that the Commissioner's determination is in error.  Rule 142(a).  The taxpayer's burden of proof includes the burden of substantiation.  Nevertheless, where the taxpayer is unable to substantiate expenses through adequate records or other proof, the Court may estimate the deductible amount, if some deductible amount is suggested by other evidence, under the so-called Cohan rule, bearing heavily, if the Court chooses, upon the taxpayer whose inexactitude is of its own making.  Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930).  The Cohan rule does not apply to travel, entertainment, gifts, and listed property.  Sec. 274(d).

Petitioner's net operating loss deductions for 1989 and 1990, for present purposes, consist of four parts: (1) NII's depreciation deductions, (2) NII's interest deductions, (3) NII's other deductions, and (4) losses incurred by NII's subsidiaries.  Our determination of petitioner's unadjusted basis in the Burke Property will determine not only the depreciation deductions for the net operating losses in prior years, but will also establish petitioner's entitlement to these deductions in the current years.  Furthermore, our resolution of the deductibility of the

interest on the McMahon Loan applies to both petitioner's 1988 net operating loss and to the current years.

Respondent denied all of petitioner's depreciation deductions for lack of substantiation of its basis in the Burke Property and for failure to establish a method of depreciation. Petitioner, however, has established a method of depreciation and also proven a substantial portion of its unadjusted basis in the Burke Property. When Senter Associates incorporated and formed petitioner in a section 351 transaction, in which no gain was recognized, the basis of the Burke Building was carried over to petitioner from the prior partnership. Proof of Senter Associates' basis in the building, therefore, establishes petitioner's basis.

Senter Associates assumed a $304,271.63 mortgage encumbering the Burke Building when it purchased the property from Parr. No credible evidence proves that Senter Associates paid any more for the Burke Building. During the time it held the building, the partnership accumulated $15,666.91 in depreciation. Petitioner's unadjusted basis in the Burke Building, therefore, was initially $288,604.72 to be reduced by $55,000 allocated to the land (determined in accordance with the method of allocating the strike price of Burke's purchase option under the Burke Lease).

Under the Burke Lease, Burke may purchase the Burke Property when the lease ends in 1997. The price includes $76,600 for the

land, including the land on which the Addition was built, and $502,500 for the buildings and improvements. Under the Burke Lease agreement, the price of the buildings increases over time, determined with reference to the Consumer Price Index, whereas the price of the land does not. Burke, therefore, had an incentive to bargain for allocating more of the option price to the land, and Senter Associates had an incentive to bargain for a low land allocation. The land allocation in the lease, therefore, is a bargained for allocation and is a strong indication of the value of the land at that time. Since Senter Associates paid $21,600 for the land on which the Addition was built, $55,000 of petitioner's basis in the Burke Building itself is allocable to land. The depreciable part of petitioner's unadjusted basis in the Burke Building is therefore $233,604.72. Petitioner also spent $167,186 to build the Addition.

As for petitioner's method of depreciation, respondent insists that petitioner failed to establish one. We are satisfied, however, that petitioner has consistently used the straightline method of depreciation for the Burke Building with a useful life of 28-1/2 years, and the 125-percent declining balance method with a useful life of 30 years for the Addition. Because petitioner's initial unadjusted depreciable basis in both the Burke Building and the Addition is lower than the amount petitioner claims, the depreciation deductions will be

recalculated under Rule 155. Section 1016(a)(2)(A), which requires basis to be adjusted for the depreciation "allowed", creates a problem in this case for the years in which petitioner has a net operating loss. For those years, the other deductions modified herein and affecting petitioner's losses are to be deducted first, and then the amount of the depreciation allowed is to be determined. Sec. 1.1016-3(e), Income Tax Regs.

Except as regards the McMahon Note, respondent argues that petitioner failed to substantiate its interest expense. Petitioner, however, has proven the beginning balances, the ending balances, and with a reasonable degree of certainty the interest rates of the TIAA Loan and the San Francisco Loan. For purposes of the Rule 155 calculation, amortization tables, showing payments made and the amount of allocable interest, can be derived from these numbers.

Unlike the TIAA Loan, however, the San Francisco Loan had a variable interest rate. The interest on this loan is only in issue from March 4, 1988, through December 31, 1988. The interest rate was fixed at 9.5 percent until September 1, 1988. The monthly payments on the loan for the entire period were fixed at $3,994.06. A San Francisco Federal Savings loan statement of December 12, 1988, reflects a loan balance as of that date of $473,573.08. If the parties are unable to compute the interest on the San Francisco loan for the March 4 to December 31, 1988,

period, petitioner may move to reopen the record for the sole purpose of offering additional evidence regarding the San Francisco Loan interest deduction for this period.

As for the Investor Group Loan, the ending balance as of October 29, 1985, is not in evidence. But because the deed of trust for the Investor Group Loan overlaps the deed of trust for the Owens Loan by only a month, we believe that the Owens Loan effectively refinanced the Investor Group Loan. We, therefore, find that the principal balance of the Investor Group Loan increased from $75,000 to $85,000 between June 10, 1982 and October 29, 1985.

The interest rate for the Investor Group Loan and for the Owens Loan is also unknown. Nevertheless, we believe petitioner accrued some interest on these notes, and that a reasonable rate of interest for the period in question would be 5-1/2 percent simple interest per annum. Interest deductions from these notes will be recalculated on this basis under Rule 155.

The McMahon Note accrued interest in 1989 and 1990. The McMahon Note requires no payment until December 31, 1997, the day before the Burke Lease terminates, or until petitioner sells the Burke Property. Petitioner claims that since it is an accrual method taxpayer, it is entitled to deduct the interest currently. Respondent denied petitioner's deduction, asserting that petitioner's liability was neither fixed nor certain. Respondent

contends that because the note was nonrecourse and the Burke Property could be exchanged by petitioner under section 1031 without repaying the note, petitioner's liability on the note was uncertain. We find respondent's logic less than compelling.

Even assuming that petitioner could have exchanged the Burke Property without repaying the McMahon Note, an exchange partner would reduce his valuation of the Burke Property according to the note's balance. And, consequently, petitioner would receive less in the exchange. In economic terms, petitioner's burden was certain.

As for petitioner's other deductions from the loss years, petitioner has introduced only its unaudited books of original entry and other accounting records based upon them. While we believe that petitioner's witnesses testified truthfully and that petitioner's management was not dishonest, its books are unreliable. Petitioner cannot substantiate all of its deductions for the current years in issue, years in which it supposedly kept its underlying documentation. For example, petitioner's mileage logs for the Malibu contained miles allocable to the Cougar. Petitioner included part of the fees paid to Charles for investigating prospective exchange properties under "professional services" rather than "fees". Petitioner's books standing alone fail to prove that petitioner incurred the other deductions from the loss years.

The fourth category of deductions that compose petitioner's net operating losses are its subsidiaries' losses. Petitioner's deductions for Controlled Casting and Industrial Management are supported only by petitioner's unaudited books. We have found them unreliable, and therefore disregard the losses from these subsidiaries in calculating petitioner's net operating losses.

Petitioner has, however, made a prima facie case with regard to Sale By Owner's and Far Western's losses. Respondent argues that these subsidiaries were not businesses and that their expenses had no business purpose. We disagree.

Petitioner's witnesses testified that Far Western and Sale By Owner were engaged in business as real estate brokers. This testimony was corroborated by corporate minutes. Respondent points to sworn affidavits from the McMahon Litigation that tell a sordid story of the Byrne family members violating their fiduciary duty and plundering the corporate coffers, but the Judge in that case imposed sanctions against the plaintiffs and stated: "There is no factual basis; there is no legal basis for your continuing to proceed in this case."

Rather than engaging in corporate plundering, petitioner was simply unlucky. Sale By Owner was beginning to show a profit until McMahon filed his shareholder's derivative suit. The suit consumed much of the time of petitioner's management and diverted attention from the subsidiaries. And McMahon's son, Hugh,

stopped his membership with the Desert Area Multiple Listing Service and Board of Realtors. Because Sale By Owner and Far Western operated under Hugh's brokerage license, his membership cancellation effectively prevented the two companies from further operation.

Petitioner substantiated the expense of Sale By Owner and Far Western by both books and canceled checks. Respondent asserts that some of the checks paid unrelated personal expenses of the principals. There are several hundred checks, and respondent has failed to direct us to the offending ones. Petitioner has made a prima facie case on this point, and respondent has offered no countervailing evidence. Petitioner is entitled to include the losses from Sale By Owner and Far Western in the calculation of its net operating losses.

In addition to net operating losses, depreciation, and interest, respondent denied every other deduction petitioner claimed for 1989 and 1990 on the grounds of lack of business purpose and lack of substantiation. Respondent has since conceded some of these other deductions, but $10,454.15 and $13,848.06 of them for 1989 and 1990, respectively, remain in controversy. Of these deductions still in controversy, respondent has admitted that petitioner substantiated a total of $5,308.89 and $8,062.02 for 1989 and 1990, respectively. Petitioner has also established that during those years its

business included managing the Burke Property, collecting its liability against IML, and selling Lot 51. Petitioner also spent considerable time and money attempting to exchange the Burke Property for other real estate in a section 1031 transaction. Nevertheless, several of petitioner's claimed deductions deserve special attention.

Several checks to the S.F. Commercial Club in both 1989 and 1990, a check to the Secretary of State of Colorado for $5 in 1990, and one to the Riverside County Clerk's Office for $67.80 in 1990 are unexplained, and are therefore disallowed.

Petitioner claims that it maintained "key man insurance" on Byrne. Byrne testified that he had been an officer of the corporation, off and on, over the years. The corporate minutes indicate that he was also petitioner's vice president during 1989 and 1990. Petitioner was a 40-percent beneficiary under the policy. Under these facts, section 264(a) controls deductibility. It provides:

- 28 -

(a) General Rule--No deduction shall be allowed for--

(1) Premiums paid on any life insurance policy covering the life of any officer or employee, or of any person financially interested in any trade or business carried on by the taxpayer, when the taxpayer is directly or indirectly a beneficiary under such policy.

Since Byrne was an officer of petitioner, and since petitioner was a beneficiary of the policy, petitioner may not deduct the premium it paid on that policy. Merrimac Hat Corp. v. Commissioner, 29 B.T.A. 690 (1934); Klinck v. Commissioner, a Memorandum Opinion of this Court dated Dec. 31, 1952.

Respondent argues that petitioner was not entitled to deduct automobile expenses due to lack of business purpose and substantiation. Section 274(d) imposes stringent substantiation requirements for travel, entertainment, gifts, and "listed property (as defined in section 280F(d)(4))". Passenger automobiles are listed property under section 280F(d)(4)(i). Section 274(d) denies these deductions unless:

the taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility or property, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility or property, or receiving the gift. * * *

Under section 274(d), deductions for automobile expenses or travel expenses may not be estimated. Instead the taxpayer must

provide adequate records or corroborate testimony with other evidence.

Petitioner proved that the business purpose behind Byrne's use of the Malibu and Cougar automobiles was to find a section 1031 exchange property, and to inspect the Burke Property. Byrne also recorded in mileage logs the time, place, distance, and business reason for his drives in the Malibu. The logs substantiate 10,305 miles in 1989 and 7,523 miles in 1990. Respondent did not argue that the mileage rates were incorrect. Petitioner is therefore entitled to deduct 22.5 cents per mile for 1989 and 26 cents per mile for 1990.

Petitioner sought to deduct the insurance and repair costs attributable to the Cougar for 1990. Generally, when a taxpayer deducts the actual cost of operating an automobile, he is required to allocate that cost between business and personal use, and to substantiate that allocation. Henry Schwartz Corp. v. Commissioner, 60 T.C. 728 (1973); sec. 1.274-5T(b)(6)(i), Temporary Income Tax Regs., 50 Fed. Reg. 46006, 46014 (Nov. 6, 1985). In the past, if the taxpayer provided the Court with a basis upon which to estimate an allocation, the Court has estimated it under the Cohan rule. Sapp v. Commissioner, 36 T.C. 852 (1961), affd. 309 F.2d 143 (5th Cir. 1962). Now, however, section 274(d) prohibits such an estimation. Sec. 1.274-5(a) Income Tax Regs. Because petitioner has not proven the total

1990 mileage of the Cougar, we cannot allocate the expenses between business and personal use. Petitioner's repair deductions are, therefore, denied.

Section 274(d) also applies to travel expenses. Petitioner has failed to prove its business purpose for the $48.77 travel expenses incurred in 1989. Section 274(d) requires substantiation of the business purpose for each item. Sec. 274(d)(2). Petitioner submitted a receipt from the Madonna Inn in San Luis Obispo, California, for the night of December 27, 1989, and Byrne's mileage logs indicate that he drove to San Luis Obispo on that date, but for that particular trip the logs do not indicate a business purpose.

As for the remainder of petitioner's expenses--fees of Charles, management fees of Byrne, rents, other insurance, telephone, subscriptions, other office expenses, other professional services, and other travel expenses--totaling $5,978.96 and $9,463.30 for 1989 and 1990, respectively, we find that petitioner has proven its business purpose. We therefore allow them to the extent substantiated; i.e., $3,151.91 and $6,963.05 for 1989 and 1990, respectively. The unsubstantiated expenses are supported only by petitioner's books. We have already found them unreliable, and we therefore deny those deductions.

Respondent determined accuracy-related penalties for negligence under section 6662(a) in the amounts of $2,457 and $2,450 for 1989 and 1990, respectively. These penalties arose from disallowed deductions. Respondent asserted by amended pleadings an additional $15,182 to the accuracy-related penalty for 1990. Respondent based this additional penalty on unreported income from 1990. While petitioner bears the burden of proof as to the penalties as determined by respondent in the deficiency notice, respondent bears the burden of proof under Rule 142(a) for the additional penalty.

Negligence, for the purpose of section 6662(a), includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code. Sec. 6662(c). Petitioner destroyed books and records needed to prove its net operating losses, failed to maintain records necessary to substantiate its deductions, and mixed up the nondeductible mileage of one car with the deductible mileage of another. Petitioner is liable for negligence to the extent that the deductions that we have denied result in an underpayment for each of the years in issue.

With respect to the additional penalty for 1990, however, respondent has failed to prove negligence. Petitioner's subsidiary, Far Western, an accrual basis taxpayer, performed services for its client, IML, sometime in the mid-1980s. The

subsidiary, however, was not paid immediately. Then, in 1990 after petitioner had liquidated the subsidiary, petitioner received Lot 51 as compensation. Neither the subsidiary nor petitioner ever included in income the earnings from these services, but prior to trial petitioner conceded that it received $112,000 of services income for 1990 upon the receipt of Lot 51.

Nevertheless, petitioner did not concede negligence. According to the regulations, income accrues "when all events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy." Sec. 1.451-1(a), Income Tax Regs. It is unclear why petitioner conceded that the service income accrued during a year in issue and not when petitioner's subsidiaries performed the work in the mid-1980s. The record does not disclose the terms of the service contract or the specific services performed, nor does it disclose why IML delayed payment. We therefore hold that respondent failed to prove that petitioner is liable for the negligence penalty attributable to the receipt of Lot 51.

To reflect the above,

Decision will be entered

under Rule 155.